EXHIBIT E

# BEAR STEARNS
## Institutional Account Agreement

Title: _Amevincto Management Inc._

Account Number: _102 - 01485_

Dated as of: _3/6/02_

This agreement ("*Agreement*") sets forth the terms and conditions under which Bear, Stearns & Co. Inc., Bear, Stearns Securities Corp. and their Affiliates (as defined in Paragraph 3 below) will open and maintain account(s) (including, but not limited to, the account specified above) in your name, engage in Activities (as defined in Paragraph 3 below) and otherwise transact business with you.

**1. Parties.** You hereby agree that the parties to this Agreement shall consist of you and each of the Bear Stearns entities listed on the signature page hereof and each of their Affiliates at which you open an account or accounts, with which you otherwise transact business or with which you engage in an Activity, whether listed or not herein (which shall automatically become a party hereto by virtue thereof), which entities are referred to herein individually and collectively as a "*Bear Stearns entity*", "*Bear Stearns*", "*us*", "*our*" or "*we*".

**2. Applicable Law and Regulations.** All Activities shall be subject to all applicable laws, rules and regulations, and to the applicable provisions of the constitution, rules and customs of the exchange or market (and clearing house) where executed and of governing self regulatory bodies.

**3. Security Interest and Lien.** You hereby grant to each Bear Stearns entity a valid and first priority, perfected, continuing security interest in and assign (a) all property now or hereafter held or carried by any Bear Stearns entity in any of your accounts, all property in which you now have or hereafter acquire an interest which is now or hereafter held by or through any Bear Stearns entity and all property held or otherwise subject to the control of any Bear Stearns entity or agent thereof, including (without limitation) all margin, securities, monies, and investment property (including without limitation all financial assets and instruments), (b) all rights you have in any Obligation (as defined in Paragraph 3 below) of any Bear Stearns entity, (c) any and all rights, claims or causes of action you may now or hereafter have against any Bear Stearns entity (including without limitation all rights you have in any repurchase agreement to which any Bear Stearns entity is a party) and (d) all proceeds of or distributions on any of the foregoing (collectively (a) through (d), "*Collateral*"), as security and margin for the payment and performance of any and all of your Obligations to each Bear Stearns entity; provided, however, that Collateral pledged by you in connection with a particular Activity shall secure first your Obligations with respect to that Activity and, second, your Obligations with respect to all Activities, provided further, that Bear Stearns' security interest in any rights you may have under a Master Agreement (as defined below) shall be limited to your right to receive the net amount due to you (if any) under the close-out and netting provisions of such Master Agreement following the occurrence of an event of default or early termination event (however defined) under such Master Agreement. The description of any property that is Collateral with respect to any Activity, including, but not limited to, Collateral described in any confirmation, account statement, or Activity Report (as defined in Paragraph 8 below), is hereby incorporated into this Agreement as if fully set forth herein and constitutes Collateral hereunder.

You and each Bear Stearns entity, hereby acknowledge and agree, for the benefit of each Bear Stearns entity, that all Collateral is held as Collateral by each Bear Stearns entity for itself, and, as agent and bailee for all other Bear Stearns entities. Each Bear Stearns entity agrees to act as agent and bailee of and for each other Bear Stearns entity in respect of the Collateral and shall hold any Collateral both as secured party and as agent and bailee of and for each other Bear Stearns entity. Each Bear Stearns entity, shall and hereby agrees to, and you agree that it may, comply without your further consent, with any orders or instructions of each other Bear Stearns entity with respect to the Collateral, including (without limitation), (a) any entitlement orders or other instructions, including without limitation, all notifications it receives directing it to transfer (including, without limitation, to a Bear Stearns entity) or redeem any Collateral and (b) if the Bear Stearns entity is a commodity intermediary, any instructions to such Bears Stearns entity to apply any value distributed on account of a commodity contract as directed by each other Bears Stearns entity. Each Bears Stearns entity has the right, in its sole discretion, to not comply with (i) any entitlement order or other instructions originated by you or a third party that would require a Bear Stearns entity to make a delivery of Collateral to you or any other person and (ii) any instruction from you to apply any value on account of any commodity contract (whether such value is distributable or not), to the extent that such Collateral is necessary to satisfy any Obligation (including, without limitation, any requirement for margin or other security) to itself or any Bear Stearns entity if such other Bear Stearns entity requests (orally or in writing, itself or through an agent) that such entitlement order or instruction not be complied with. You agree that the actions of a Bear Stearns entity in not complying with your instructions as allowed in this Paragraph 3 satisfy any duties we may have under the Uniform Commercial Code. This Paragraph 3 shall survive the termination of this Agreement, thereby extending the right to any lien and security interest until such time as, in the sole discretion of Bear Stearns, security for the repayment of your Obligations in no longer required.

Each Activity has been entered into in consideration of each other Activity and your performance of each and every one of your Obligations when due is a condition precedent to Bear Stearns' performance of its Obligations; provided, however, that Activities shall not be merged. In furtherance of the foregoing, any Bear Stearns entity may, at any time and without prior notice to you, use, credit, apply or transfer any such Collateral (or make other arrangements) at, or with respect to any Obligation to, any Bear Stearns entity to satisfy or secure any of your Obligations.

"*Activity(ies)*" means all transactions, agreements, loans, promises of performance, open contractual commitments, Loans (as defined in Paragraph 4 below), Clearing Transactions, guaranties and extensions of credit between Bear Stearns acting as either principal or agent on your behalf and you, whether arising hereunder, heretofore or hereafter.

"*Affiliate*" (when used with respect to a Bear Stearns entity) shall include each trust, limited liability company, corporation, partnership and any other entity which is owned directly or indirectly by one or more of the Bear Stearns entities listed on the

signature page, or which is controlled by or under common control with one or more of the Bear Stearns entities listed on the signature page, whether such entity exists as of the date hereof or is hereafter created or acquired.

*"Clearing Obligation"* means each and every obligation of any Bear Stearns entity to you and from you to any Bear Stearns entity in connection with any Clearing Transaction, or its acceleration, cancellation, termination or liquidation, whether arising hereunder, heretofore or hereafter or whether fixed, liquidated or contingent.

*"Clearing Transactions"* means all actions and agreements relating to the clearance or settlement of transactions in securities, currencies or commodities for you and all transactions in which any Bear Stearns entity provides clearing, special clearing or settlement services to you (including, without limitation, as prime broker in connection with prime broker transactions or in connection with any give-up, free delivery, or when acting as a securities clearance and/or settlement agent in any clearing system, market, or exchange, domestic or international).

*"Master Agreement"* means any November 1995 version, 2000 version or any later version of The Bond Market Association / International Securities Market Association Global Master Repurchase Agreement, any Overseas Securities Lender's Agreement or Global Master Securities Lending Agreement of the International Securities Lending Association, any ISDA Master Agreement and any similar industry form which contains close-out and netting provisions and in each case which is governed by English law and which is entitled to the benefits of a netting opinion and which is entered into between you and Bear Stearns.

*"Obligation(s)"* means each and every obligation or liability you owe to Bear Stearns or Bear Stearns owes to you (as the context requires) including, without limitation, payment and delivery obligations, any Clearing Obligation, any obligation or requirement you have hereunder to liquidate or otherwise reduce a position, account or Activity, any "debt" as defined in the United States Bankruptcy Code *(the "Code")*, any obligation arising under a guarantee or indemnity that you have provided to a Bear Stearns entity and every obligation or requirement you have under any Activity to maintain or deliver Collateral with respect to such Activity (whether or not performance is due) or its acceleration, cancellation, termination or liquidation, or in connection with a guarantee, whether arising hereunder, heretofore, or hereafter and whether fixed, matured, unmatured, liquidated, unliquidated or contingent.

You agree that with respect to Collateral and the delivery of Collateral, you will take such action as is necessary to cooperate with Bear Stearns, and you hereby irrevocably appoint each Bear Stearns entity to be your attorney in fact and your agent *("attorney")* (with full powers of substitution and delegation) to act in your name and on your behalf and as your act and deed or otherwise under a power coupled with an interest to execute, sign, seal, deliver, lodge and file any documents which such Bear Stearns entity may require for perfecting or preserving its security interest in the Collateral that you have delivered, or, upon the occurrence of a Default (as defined below), vesting the Collateral in the Bear Stearns entity, and otherwise generally to sign, seal and deliver and otherwise perfect and preserve any such legal or other mortgage, charge, security interest or assignment and all such deeds and documents and to do all such acts and things as may be required for the full exercise of the powers

hereby conferred including, but not limited to, executing and filing any financing statements and charges, and upon the occurrence of a Default, executing and filing such documents as are appropriate to effect any sale, lease, liquidation, disposition, realization, receipt of such Collateral or the enforcement of any of the Bear Stearns entity's rights hereunder. You hereby covenant with us to ratify and confirm any deed, document, act and thing and all transactions that any such attorney or agent may execute or do to perfect or preserve its security interest and that you will not take any action that would impair a Bear Stearns entity's perfected security interest in Collateral.

You represent and covenant that (a) you have the right to pledge and assign to Bear Stearns the Collateral pledged and assigned hereunder; (b) the Collateral is free and clear of any liens, claims or encumbrances, except in favor of a Bear Stearns entity; (c) upon your delivery of the Collateral or such other actions as shall have been taken on or prior to the pledge thereof, this Agreement will create, as security for your Obligations, a valid and perfected first priority security interest in all Collateral pledged by you; (d) if required, you will promptly note in your register of mortgages and charges the security interest created by this Agreement over your property and no further filings, registrations, licenses, recordings or consents of or with any governmental body, agency or official are necessary to create, preserve or perfect our security interest in all such Collateral (other than UCC financing statements or charges which may be required) and (e) any guarantee provided by you to any Bear Stearns entity shall continue to be effective or be reinstated (as the case may be) if at any time all or any part of any payment or interest or other performance by the obligor under such guarantee is avoided or is otherwise restored or repaid by any Bear Stearns entity. You agree that you shall not sell, assign or transfer the Collateral, issue orders or otherwise dispose of the Collateral if a Default has occurred and is continuing or to the extent that such Collateral is necessary to satisfy an Obligation to a Bear Stearns entity (including, without limitation, any requirement for margin or other security) or create or permit to exist any lien, claim or encumbrance (other than the security interest created hereby or in favor of a Bear Stearns entity) upon the Collateral. Nothing herein shall be construed as a requirement that a Bear Stearns entity cause Collateral which is held on account of a particular Activity to be attributed (in whole or in part) to any other Activity in determining whether a Bear Stearns entity is entitled to make a demand or call upon you for additional securities, monies or other property under any other Activity, or to preclude any Bear Stearns entity from making a demand or call upon you for additional securities, monies or other property.

You waive marshalling of assets and any similar doctrine dealing with the application of collateral. Subject to the terms of this Agreement, Collateral may be utilized or applied by Bear Stearns entities as they determine.

You agree that your execution of this Institutional Account Agreement shall constitute notice to each Bear Stearns entity of the security interest you have granted to each other Bear Stearns entity herein, and each Bear Stearns entity holding Collateral is on notice of the security interest granted to each other Bear Stearns entity.

**4. Loans.** We may from time to time lend you money or extend you credit in connection with the purchase or sale of securities or Activities *(a "Loan")*. Each Loan shall be considered an Activity under this Agreement. We shall agree with you from time to time upon the terms of each Loan, including the rate of interest payable by you in respect of any such Loan. Any debit balances in connection

with any Activity, including any Loan, are repayable immediately upon demand.

**5.  Deposits on Activities; Margin; No Obligation.**    Whenever Bear Stearns, in its discretion, considers it necessary for its protection, it may require you and you hereby agree to immediately (a) deposit cash or required property in your account(s) prior to any applicable settlement date in order to assure due performance of your open contractual commitments, and (b) deposit such margin and provide such additional margin (unless otherwise agreed in writing) as Bear Stearns may require.  Immediately upon your failure to do any of the foregoing, whether with or without further demand, call or notice, Bear Stearns shall be entitled to exercise all rights and remedies provided in Paragraphs 3 and 6 hereof. No demands, calls, tenders or notices that Bear Stearns may have made or given in the past in any one or more instances shall constitute a requirement that Bear Stearns make or give the same in the future.  Margin calls made by Bear Stearns may be communicated orally and need not be confirmed in writing.

For purposes of determining whether or not to require margin in connection with an Activity, the market value of all Collateral shall be determined by Bear Stearns, in its sole discretion.  Notwithstanding any provision to the contrary in this Agreement and any other agreement, the margin requirement hereunder and with respect to each Activity shall be an amount not less than the amount required by law, rule or regulation (including, without limitation, an applicable clearing house, self-regulatory organization, market or exchange rule or regulation). Unless otherwise agreed to the contrary at the initiation of an Activity, Bear Stearns, in its sole discretion, may decline to accept any property as margin. For the avoidance of doubt, Bear Stearns shall have no obligation to take into account Collateral held at a Bear Stearns entity in determining margin requirements or in making demands for margin with respect to Activities at any other Bear Stearns entity.

You agree that Bear Stearns does not, by entering into this Agreement, obligate itself to enter into Activities with you.  Rather Bear Stearns, in its sole discretion, may choose which Activities, if any, it wishes to enter into with you.  You further agree that the refusal by Bear Stearns to enter into an Activity with you shall not operate as a termination of this Agreement.

Bear Stearns, in its sole discretion, may set the maximum aggregate amount of all Obligations you may owe to Bear Stearns and, in its sole discretion, may, from time to time, set aggregate maximum amounts of assets, positions or Activities that may be held by you with, or through Bear Stearns.  Upon notification by Bear Stearns, you will liquidate, or otherwise reduce, the amount of such positions, accounts or Activities that exceed the respective maximum set by Bear Stearns.  You agree that upon your failure to liquidate such amounts, Bear Stearns may immediately do so on your behalf and/or may treat your failure to liquidate or otherwise reduce assets, positions or Activities as a Default hereunder.

**6.  Default; Remedies.**  Each of the matters provided for in (a) through (g) below, shall be referred to as a "*Default*": if (a) (i) you are dissolved or become insolvent, (ii) you make a general assignment for the benefit of, or enter into a reorganization, arrangement, or composition with creditors, (iii) you become generally unable, fail or admit orally or in writing your inability to pay your debts or perform your obligations or Obligations as they become due, (iv) you seek, consent to, acquiesce in or become subject to the appointment of any trustee, rehabilitator, administrator, receiver, liquidator or analogous officer of you or any material part of your property, (v) there is presented or filed in respect of you or you file a petition in any court or before any agency alleging or for your bankruptcy, winding-up or other insolvency (or other analogous proceeding) or seeking any reorganization, arrangement, composition, re-adjustment, administration, liquidation, dissolution or similar relief under any statute, law or regulation, (vi) a resolution for your winding up, official management or liquidation is passed, (vii) a secured party takes possession of all or substantially all of your assets or levies, enforces or issues on or against any of your assets, a distress, execution, attachment, sequestration or other legal process, (viii) you cause or become subject to any event that, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (i) to (vii) or (ix) you take any action in furtherance of any of the foregoing acts; (b) you breach repudiate or default under or in connection with any Activity, including, but not limited to, your failure or unwillingness or your oral or written statement of your inability or unwillingness to meet a margin call (including, without limitation, any increase in margin or Collateral requirements) or any other Obligation hereunder; (c) we reasonably believe that we may not be able, without delay, to apply Collateral or set off our Obligations against your Obligations; (d) an event, circumstance or condition occurs that, in our judgment, materially impairs your creditworthiness or ability to perform your Obligations or otherwise causes us to view ourselves as insecure; (e) any of your representations or warranties shall have been untrue in any material respect when made or deemed repeated; (f) a party who has guaranteed any of your Obligations to any Bear Stearns entity (a "*Guarantor*"), fails to perform under the guarantee or a Default occurs with respect to Guarantor or (g) you fail to perform under a guarantee you provided to any Bear Stearns entity. If a Default occurs, then, without notice, each and any Bear Stearns entity, at its option, may: (A) consider and declare you in default of any and all Activities with such Bear Stearns entity; (B) in whole or in part, accelerate, cancel, terminate and liquidate or otherwise close out any Activity with you; (C) set off, net, and/or recoup a Bear Stearns entity's Obligations to you against any of your Obligations and each Bear Stearns entity's Obligations shall automatically be reduced first by the amount of all of your Obligations to it and then by your Obligations to other Bear Stearns entities, unless, and to the extent, we determine otherwise; and you expressly waive any requirement of mutuality to allow one Bear Stearns entity to set off, net or recoup against any Obligation of a different Bear Stearns entity to you; (D) retain any Collateral and withhold payment and performance of any Obligation to you to pay, secure, set-off against, net and/or recoup any Obligation you owe to a Bear Stearns entity; (E) foreclose, collect, sell or otherwise liquidate any Collateral a Bear Stearns entity selects in its reasonable discretion, in any order and at any time, and apply the proceeds thereof to satisfy any of your Obligations; (F) buy any and all property that may have been sold short; (G) in each Bear Stearns entity's reasonable discretion, convert any Obligation from one currency into another currency; (H) take any other action permitted by law or in equity or by any Activity necessary or appropriate to protect, preserve or enforce our rights or to reduce any risk to us of loss or delay. At any sale of Collateral or other sale or purchase permitted hereunder or otherwise, Bear Stearns may sell or purchase to or from itself or third parties; and the parties hereto acknowledge and agree that the securities subject to such sale or purchase are instruments traded in a recognized market.  You shall be liable to the extent permitted by law for interest on any amount not paid when due for the period from the due date thereof to the date of payment at a rate equal to the higher of (i) the Prime Rate in effect

from time to time and (ii) the highest rate applicable to any defaulted Activity, plus in either case 2%. *"Prime Rate"* shall mean the prime rate of U.S. money center commercial banks as published in the Wall Street Journal. You agree that Bear Stearns may liquidate Collateral in such manner as it determines in its sole discretion and that it has no obligation to liquidate any Collateral within any particular time or in any particular manner. You will be liable to such Bear Stearns entity for any damage, loss, cost and expense incurred, including any damage, loss, cost and expense that (x) is incurred to put it in the same economic position as it would have been in had a Default not occurred, including any attorney's fees, interest, damage, loss, cost and expense that arises out of any other commitment it has entered into in connection with or as a hedge in connection with the Activity or in an effort to mitigate any resulting loss to which it is exposed because of a Default or (y) is connected with any claim against a Bear Stearns entity that relates to your Default, or a claim made by you or in your right pertaining to any action or inaction taken or omitted by us after your Default.

**7.  Fees and Charges; Account Related Costs; Indemnification.** You understand that Bear Stearns may charge commissions and other fees for execution, clearing, custody or any other service furnished to you, and you agree to pay such commissions and fees at Bear Stearns' then-prevailing rates. You understand further that such commissions and fees may be changed from time to time, upon prior written notice to you. You will pay any applicable value added tax and such other taxes, duties and fees as are applicable to Activities entered into by you. If you are required by law to make any deduction or withholding from any payment due under any Activity or hereunder, you shall pay to us simultaneously with making such payment an additional amount as may be necessary in order for the total amount received by us after all deductions and withholdings to be equal to the amount which we would have received had no deduction or withholding been made.

The fees payable by you and the transaction charges incurred by you shall be paid daily by automatic deduction from your accounts, unless otherwise agreed in writing. Out-of-pocket expenses incurred by Bear Stearns in the performance of its services hereunder, and all other proper charges and disbursements in connection with your Activities shall be paid by you and may be deducted by Bear Stearns from your accounts. Any and all taxes, including any interest and penalties with respect thereto, which may be levied or assessed under present or future laws upon or in respect to your accounts, Activities or upon or in respect of income thereof shall be paid by you and may be deducted by Bear Stearns from your accounts.

You hereby agree to indemnify and hold Bear Stearns harmless from and against any and all losses, claims, including, without limitation, claims asserted by third party brokers or dealers in connection with Clearing Transactions, damages, liabilities, obligations, penalties, judgments and awards, and to pay, on demand, all reasonable direct and indirect costs, liabilities and damages incurred by Bear Stearns (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with (a) your Obligations, (b) Clearing Transactions, (c) your breach of this Agreement, (d) enforcing its rights hereunder, (e) any investigation, litigation or proceeding involving your accounts, any property therein (including, without limitation, claims to such property by third parties) or any Activity, (f) your use of or access to any Bear Stearns or third-party system (excluding the ordinary costs of maintaining and using any such system) or (g) Bear Stearns' acting in reliance upon your instructions including, but not limited to, instructions transmitted via facsimile by you or your authorized agents or, if your account is

introduced to Bear Stearns by another broker, the instructions of such other broker ((a) through (g), *("Costs")*. In each case, whether or not demand has been made therefor, you hereby authorize Bear Stearns to charge your account(s) for any and all such Costs. This indemnity shall survive the termination of this Agreement.

**8.  Confirmations and Account Statements.** Reports of trades executed with Bear Stearns, prime broker transactions, futures transactions and other Activities with you *("Activity Report(s)")* that have been provided or made available to you by 10:00 a.m. (New York time) on the business day immediately following the trade date shall be conclusive if not objected to in writing by 12:00 noon (New York time) on that day or, if such Activity Reports are provided or made available to you after 10:00 a.m. (New York time) on the business day immediately following the trade date, then no later than two hours after such reports have been provided or made available to you. Information contained in confirmations and account statements to the extent not included in such Activity Reports shall be conclusive if not objected to in writing within three days in the case of confirmations and ten days in the case of account statements, after such documents have been transmitted to you by mail or otherwise.

**9.  Debit Balances/Truth-in-Lending.** You hereby acknowledge receipt of Bear Stearns' Truth-in-Lending disclosure statement or any analogous disclosure statement. You understand that interest will be charged on any debit balances in your accounts in accordance with the methods described in such statement or in any amendment thereof or revision thereto which may be provided to you or at the rate provided for in Paragraph 6, if higher and not prohibited by applicable law. Any debit balance that is not paid at the close of an interest period will be added to the opening balance for the next interest period.

**10.  Introduced Accounts; Clearing Activities.** If any of your account(s) is introduced to Bear Stearns by a third party broker and is carried by any Bear Stearns entity as clearing agent for such broker, unless such Bear Stearns entity receives from you prior written notice to the contrary, we may accept and process from such other broker, without any inquiry or investigation: (a) orders for the purchase or sale of securities and other property in your account(s) on margin or otherwise and (b) any other instructions concerning your account(s) or the property therein. Bear Stearns also has the right, exercisable in its sole discretion, to refuse to accept orders, cancellations or any other instruction for your account and to require you to furnish any additional documentation we deem necessary. You understand and agree that Bear Stearns shall have no responsibility or liability to you for any acts or omissions of such broker, its officers, employees or agents.

If Bear Stearns at any time engages in Clearing Transactions for you, Bear Stearns may require you to maintain a deposit with respect to Clearing Transactions, which deposit shall constitute Collateral and margin hereunder. Bear Stearns may, from time to time, amend the amount of such Collateral requirements on notice to you.

If Bear Stearns engages in Clearing Transactions for you (a) you will notify Bear Stearns of the Details (as defined below) of the Clearing Transaction in accordance with the time schedule specified by Bear Stearns, from time to time, (b) you shall bear all the risks related to each Clearing Transaction, including but not limited to, non-performance by the third party, broker or dealer and (c) you will provide Bear Stearns and be responsible for the settlement payment (including, without limitation, the necessary securities,) to enable Bear Stearns to process, clear and settle the delivery of the securities

and cash related to such Clearing Transaction, and any cash or securities necessary to meet a demand for margin made by the third party dealer and (d) if Bear Stearns engages in Clearing Transactions for you in which Bear Stearns becomes obligated to settle a trade you have placed through another broker or dealer, you will be obligated to Bear Stearns for the settlement payment (including, without limitation, the necessary securities) to enable Bear Stearns to process, clear, and settle such Clearing Transaction no later than the time at which Bear Stearns becomes so obligated. The term "Details" shall mean the specific third party, broker or dealer, the department at the specific third party dealer, the purchase or sale/settlement date, the purchase or sale price, and in connection with a repurchase or reverse repurchase Clearing Transaction, the purchased securities, the pricing rate, and the repurchase date and any other information required for Bear Stearns to process, clear and settle such Clearing Transaction. Nothing contained herein shall be construed as imposing liability on any Bear Stearns entity as a principal party in connection with any Clearing Transaction in which it is acting as agent (which agency obligations are required to be performed in accordance with this Agreement) and you shall not under any circumstance represent to any third party broker or dealer or any entity that any Bear Stearns entity acts as a guarantor of any such Clearing Transaction.

You agree that you will only execute bona-fide orders, and if required for settlement, you will request a free delivery of cash or securities only when you have reasonable grounds to believe that the contra-party and the entity who executed your order have the financial capability to complete any contemplated transaction.

For the avoidance of doubt, you acknowledge and agree that Bear Stearns (a) reserves the right at any time to place a limit (of either dollars or number of securities) on the size of transactions that Bear Stearns will accept for clearance and (b) if you execute an order in excess of the limit established by Bear Stearns, Bear Stearns shall have the right, exercisable in its sole discretion, to decline to accept the transaction for clearance and settlement.

Bear Stearns will attempt to clear such securities transactions within a reasonable period as determined by it, in its sole discretion, and utilize the same procedures it utilizes when clearing transactions on behalf of other customers. If either you or the broker who executed your order fails for any reason to settle the transaction and/or return any free delivery within a reasonable period of time, as determined by Bear Stearns, you will be solely liable to Bear Stearns for any and all loss, including expenses, caused thereby. Bear Stearns shall have no liability whatsoever to you in any such circumstance.

Notwithstanding anything in this Agreement to the contrary, if Bear Stearns at any time engages in Clearing Transactions for you, you acknowledge and agree that Bear Stearns may decline to clear or settle any transaction if it determines, in its sole discretion, that such transaction poses unacceptable risk.. In addition, to the foregoing, Bear Stearns may terminate any and all clearing activities and relationships it has with you upon thirty (30) days' written notice to you, it being understood that declining to clear or settle a prime broker transaction or any other Clearing Transaction does not constitute a termination within the meaning of this sentence. No termination under this Paragraph shall affect your Obligations.

Notwithstanding Paragraph 12 of this Agreement, with respect to any Clearing Transaction, Bear Stearns may accept any instructions orally communicated. Bear Stearns shall incur no liability to you in acting upon any oral instruction reasonably believed by Bear Stearns to have been properly made by you. If a written instruction confirming an oral instruction is not received by Bear Stearns prior to a transaction, it shall in no way affect the validity of the transaction authorized by such oral instruction or your authorization to effect such transaction. To the extent such oral instruction varies from any written confirming instruction, Bear Stearns shall advise you of such variance, but unless a confirming written instruction is timely received, such oral instruction shall govern. Written instructions to you from Bear Stearns shall include transmissions by or through facsimile (using the facsimile number listed below), central processing unit connection, on-line terminal and magnetic tape. Written instructions to Bear Stearns from you for the receipt, delivery or transfer of securities or funds between your accounts or to third parties may include facsimile transmission, Remote Clearance Instructions (as defined below) and Bulk Input Instructions (as defined below). Bear Stearns shall be entitled to conclusively assume that all written instructions, including facsimile transmissions, Remote Clearance Instructions and Bulk Input Instructions have been given by an authorized person, and Bear Stearns is hereby irrevocably authorized to act in accordance therewith. For purposes of this Agreement, "*Remote Clearance Instructions*" means instructions that are input via a remote terminal which is located on your premises and linked to Bear Stearns (whether directly or indirectly through Bear, Stearns Securities Corp.), and "*Bulk Input Instructions*" means instructions that are input by bulk input computer tape delivered to Bear Stearns by messenger or transmitted to Bear Stearns via such transmission mechanism as you and Bear Stearns shall agree upon from time to time. All instructions must be completed in accordance with our requirements, as established from time to time, as to the content of instructions and their manner and timeliness of delivery.

**11. Impartial Lottery Allocation.** In the event Bear Stearns holds on your behalf bonds or preferred stocks in street name or bearer form which are callable in part, you agree that you will participate in the impartial lottery allocation system of the called securities in accordance with the rules of the New York Stock Exchange, Inc. or any other appropriate self-regulatory organization. When any such call is favorable, no allocation will be made to any account with respect to which Bear Stearns has actual knowledge that its officers, directors or employees have any financial interest until all other customers are satisfied on an impartial lottery basis.

**12. Waiver, Assignment and Notices.** Neither Bear Stearns' failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Bear Stearns of any of its rights or privileges hereunder. Any assignment of your rights and Obligations hereunder or interest in any property held by or through Bear Stearns without obtaining the prior written consent of an authorized representative of Bear Stearns shall be null and void. Each Bear Stearns entity shall have the right to assign any of its rights and Obligations hereunder to any other Bear Stearns entity without prior notice to you; provided, however, that if you object within five days of notice (which notice need not precede the transfer), the transferring Bear Stearns entity shall remain obligated for any performance default by the transferee Bear Stearns entity.

Any notices, demands, or other communications from you to Bear Stearns under this Agreement shall be written, addressed to Bear Stearns, 245 Park Avenue, New York, New York 10167, Attention: Senior Managing Director, Global Credit Department or such other address of which we give you written notice and shall be effective

5

upon actual receipt by Bear Stearns at such address. Notwithstanding the foregoing, all notices from you to Bear Stearns Global Lending Limited shall be addressed to: Bear Stearns Global Lending Limited, c/o Director of Operations, Bear, Stearns International Limited, One Canada Square, London E14 5AD, England. You hereby authorize Bear Stearns to accept facsimile copies of this or any other document or instruction as if it were the original and to accept signatures on facsimiles as if they were originals.

Notices, demands, or other communications *("Notices")* to you under this Agreement and under all Activities will be delivered, transmitted or mailed to the address, telephone or facsimile number contained in the records on which Bear Stearns customarily relies, unless and until three business days after Bear Stearns has received written notice from you of a different address or telephone or facsimile number. Notices to you shall be deemed received when properly addressed (a) three (3) days after mailing postage prepaid or (b) the day delivered if personally delivered or sent by overnight courier. Notices given to you by facsimile transmission shall be deemed received during normal business hours of the recipient when the transmitting facsimile signals the successful transmission of the facsimile during such normal business hours. Notices given to you by telephone shall be deemed received when Bear Stearns calls by telephone the person authorized to receive telephone notices listed below at the telephone number listed below unless otherwise provided under any Activity.

**13. Free Credit Balances.** You hereby authorize Bear Stearns to use any free credit balance awaiting investment or reinvestment in any of your accounts in accordance with all applicable rules and regulations and to pay interest thereon at such rate or rates and under such conditions as are established from time to time by Bear Stearns for such accounts and for the amounts of cash so used. In accordance with applicable regulations, free credit balances are carried in customers' accounts pending, and with a view towards, reinvestment. Bear Stearns may determine not to pay interest on free credit balances representing either (i) uncollected funds or (ii) funds that are deposited and subsequently withdrawn prior to the expiration of the minimum time period required by Bear Stearns.

**14. Restrictions on Account.** You understand that Bear Stearns, in its discretion, may restrict or prohibit trading of securities or other property in any of your accounts.

**15. Extraordinary Events.** In no event shall Bear Stearns be liable for (a) any cost or delay caused, directly or indirectly, by war, riots, civil commotion, strikes, labor disputes, government acts, laws or regulations, exchange or market rulings, suspension of trading, embargoes, natural disasters, electrical failures, telephone communication line failures, computer failures, unavailability of the Federal Reserve Bank wire or telex or other wise or communication facility or any other cause of contingency beyond Bear Stearns' control that may prevent or delay the performance of any Bear Stearns' Obligations; or (b) any damages caused, directly or indirectly, by your introducing or executing broker, by erroneous information received from you or by your failure to deliver instructions, including, without limitation, a failure which results in a lack of position or a failure to exercise rights on your behalf.

**16. Credit Information and Investigation.** You authorize Bear Stearns and, if applicable, your broker, in its or their discretion, to make and obtain reports concerning your credit standing and business conduct. You may make a written request within a reasonable period

of time for a description of the nature and scope of the reports made or obtained by Bear Stearns.

**17. Short and Long Sales.** In placing any sell order for a short account, you will designate the order as such and hereby authorize Bear Stearns to mark the order as being "short". In placing any sell order for a long account, you will designate the order as such and hereby authorize Bear Stearns to mark the order as being "long." The designation of a sell order as being for a long account shall constitute a representation that you own the security with respect to which the order has been placed, that such security may be sold without restriction in the open market and that, if Bear Stearns does not have the security in its possession on account for you at the time you place the order, you shall deliver the security by settlement date in good deliverable form or pay to Bear Stearns any losses or expenses incurred by it as a result of your failure to make delivery on a timely basis.

**18. Consent to Loan or Pledge of Securities.** To the greatest extent permitted under applicable law and regulations, you hereby authorize Bear Stearns to lend either to itself or to others any securities which constitute Collateral hereunder together with all attendant rights of ownership, and to use all such property as collateral for Bear Stearns' general loans or other obligations or with respect to repurchase transactions. Any such property, together with all attendant rights of ownership, may be pledged, repledged, sold, hypothecated or rehypothecated or become subject to repurchase transactions either separately or in common with other property for any amounts due to Bear Stearns thereon or for a greater sum and may extend for periods longer than your Obligations, and Bear Stearns shall have no obligation to retain a like amount of similar property in its possession and control. You hereby acknowledge that, as a result of such activities, Bear Stearns may receive and retain certain benefits to which you will not be entitled. In certain circumstances, such loans or other use may limit, in whole or in part, your ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities.

**19. Standard of Care; No Advisory Role; Limitation of Liability.** Bear Stearns shall be held to a standard of reasonable care in carrying out its Clearing Obligations and Bear Stearns shall have no liability with respect to any breach of its Clearing Obligations which does not arise from willful misfeasance, bad faith or negligence on its part. The parties agree that the amount and type of your damages in respect of any failure by Bear Stearns to satisfy a Clearing Obligation shall be determined in accordance with Paragraph 24 of this Agreement, applying the substantive law of the State of New York. Bear Stearns shall be entitled to rely on and may act upon advice of counsel in all matters and shall be without liability for any action reasonably taken or omitted pursuant to such advice. Unless expressly agreed in writing to the contrary, Bear Stearns does not act as your advisor and has no duty or obligation to provide advice to you or to act on your behalf in the absence of your express instruction. You acknowledge and agree that you will not rely on Bear Stearns taking any action with respect to any account, position or other Activity.

You agree that no Bear Stearns entity shall have any liability for any consequential, incidental, special, exemplary, punitive, or any similar damages and you hereby irrevocably and unconditionally waive any right you may have to claim or recover any such damages (even if you have informed Bear Stearns of the possibility or likelihood of such damages); and, that with respect to Clearing Transactions, Bear Stearns shall have no liability for any amount in excess of the fees

received by Bear Stearns in any month with respect to Clearing Transactions, the limitation and waiver in this Paragraph 19 being an inducement to Bear Stearns to enter into Activities with you.

**20. Agents; Sub-custodians.** (a) Bear Stearns may employ agents or subcontractors in the performance of its Obligations under this Agreement or any Activity. The appointment of any such agent or subcontractor pursuant to this Paragraph 20 shall not relieve Bear Stearns of any of its Obligations under this Agreement or any Activity. For the avoidance of doubt and notwithstanding the foregoing, no clearing organization, settlement systems customarily used to clear trades in the applicable security or transaction, depository, book entry system participant or entity which Bear Stearns employs based upon customary market practice such as the Federal Reserve Bank or any participant in the Federal Reserve System book-entry system, The Depository Trust Company, The Participants Trust Company, Euroclear, Sicovam and any other similar organization (each, a "Depository") shall be considered an agent or subcontractor of Bear Stearns and Bear Stearns shall have no liability for any loss or damage arising out of the insolvency, acts or omissions of any Depository used by it.

(b) Notwithstanding the foregoing, you further acknowledge that Bear Stearns may appoint sub-custodians, including its own Affiliates, of assets held by or through Bear Stearns in your accounts. Anything in subparagraph 20(a) of this Agreement to the contrary notwithstanding, Bear Stearns will exercise reasonable skill, care and diligence in the selection of any such sub-custodian and will be responsible to you for satisfying itself as to the ongoing suitability of such sub-custodian to provide custodial services, will maintain an appropriate level of supervision over such sub-custodian and will make appropriate inquiries periodically to confirm that the obligations of such sub-custodian continue to be competently discharged. Bear Stearns will only be liable for loss or damage (subject to the limitations in Paragraph 19 above) arising out of the insolvency, acts or omissions of any sub-custodian appointed by it that is an Affiliate, but shall not be liable for any such loss or damage arising out of the insolvency, acts or omissions of any sub-custodian appointed by it that is not an Affiliate provided Bear Stearns has exercised reasonable skill, care and diligence in selecting such non-Affiliate sub-custodian.

**21. Legally Binding; Termination.** The provisions of this Agreement shall survive termination of this Agreement insofar as they relate to Obligations, Activities, actions or failures to take action relating to, arising in or with respect to the period prior to termination of this Agreement. You and Bear Stearns hereby agree that this Agreement shall extend to and be binding upon all of the parties hereto (whether now existing or hereafter added) and their respective successors and permitted assigns. You further agree that all purchases and sales shall be for your account(s) in accordance with your oral or written instructions. You hereby waive any and all defenses that any instruction for your account was not in writing as may be required by the Statute of Frauds or any similar law, rule or regulation.

**22. Amendment.** You agree that Bear Stearns may modify the terms of this Agreement at any time upon prior written notice to you. By continuing to accept services from or engaging in Activities with Bear Stearns, you will have indicated your acceptance of any such modification. If you do not accept any such modification, you must notify Bear Stearns thereof in writing and your account may then be terminated, but you will still be liable thereafter to Bear Stearns for all remaining Obligations. Otherwise, this Agreement may not be

waived or modified absent a written instrument signed by an authorized representative of Bear Stearns.

**23. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the conflict of law principles thereof.

**24. Arbitration; Consent to Jurisdiction.**

(a)

     (i) ARBITRATION IS FINAL AND BINDING ON THE PARTIES.

     (ii) THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.

     (iii) PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.

     (iv) THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.

     (v) THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

BY SIGNING THIS AGREEMENT, YOU AND BEAR STEARNS AGREE THAT CONTROVERSIES ARISING UNDER OR RELATING TO AN ACTIVITY OR THIS AGREEMENT BETWEEN YOU AND BEAR STEARNS, ITS PREDECESSORS, AND ANY OF THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND ANY OF THEIR DIRECTORS, EMPLOYEES, OR ANY CONTROL PERSONS AND ANY OF THEIR AGENTS, WHETHER ARISING PRIOR TO, ON, OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY BINDING ARBITRATION. ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE HELD ONLY AT THE FACILITIES OF, BEFORE AN ARBITRATION PANEL APPOINTED BY, AND PURSUANT TO THE RULES OF THE NEW YORK STOCK EXCHANGE, INC., THE AMERICAN STOCK EXCHANGE, INC., OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. YOU MAY ELECT ONE OF THE FOREGOING FORUMS FOR ARBITRATION, BUT IF YOU FAIL TO MAKE SUCH ELECTION BY REGISTERED MAIL OR TELEGRAM ADDRESSED TO BEAR, STEARNS SECURITIES CORP., 245 PARK AVENUE, NEW YORK, NEW YORK 10167, ATTENTION: CHIEF LEGAL OFFICER (OR ANY OTHER ADDRESS OF WHICH YOU ARE ADVISED IN WRITING), BEFORE THE EXPIRATION OF TEN DAYS AFTER RECEIPT OF A WRITTEN REQUEST FROM BEAR STEARNS TO MAKE SUCH ELECTION, THEN BEAR STEARNS MAY MAKE SUCH ELECTION. THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM, SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION. NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO

ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL:

    (x)    THE CLASS CERTIFICATION IS DENIED;
    (y)    THE CLASS IS DECERTIFIED; OR
    (z)    THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT.

SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

(b) Notwithstanding the provisions of subparagraph (a) above, either party may seek, in the U.S. District Court for the Southern District of New York or the Supreme Court of the State of New York for the County of New York, any such temporary or provisional relief or remedy ("provisional remedy") provided for by the laws of the U.S. or the laws of the State of New York as would be available in an action based upon such dispute or controversy in the absence of an agreement to arbitrate. The parties acknowledge and agree that it is their intention to have any such application for a provisional remedy decided by the Court to which it is made and that such application shall not be referred to or settled by arbitration. No such application for a provisional remedy, nor any act or conduct by either party in furtherance of or in opposition to such application, shall constitute a relinquishment or waiver of any right to have the underlying dispute or controversy with respect to which such application is made settled by arbitration in accordance with subparagraph (a) above.

(c) With respect to any application for a provisional remedy and any application for judgment on an arbitration award, each party irrevocably (i) submits to the jurisdiction of the U. S. District Court for the Southern District of New York or the Supreme Court of the State of New York for the County of New York, (ii) waives any objection which it may have at any time to the laying of venue of any proceedings brought in any such court, waives any claim that such proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such proceedings, that such court does not have any jurisdiction over such party, and (iii) consents to service of process by certified mail, return receipt requested, to the address provided for herein.

(d) You hereby irrevocably designate and appoint the individual or entity listed below as your authorized agent to receive service of process on your behalf in connection with any legal matters or actions or proceedings based upon, arising out of or relating in any way to any Activity or this Agreement. If for any reason said agent is unable to act as such, you will promptly notify Bear Stearns and within 30 days appoint an authorized agent acceptable to Bear Stearns.

**25. Severability.** If any provision hereof is or should become inconsistent with any present or future law, rule or regulation of any sovereign government or regulatory body having jurisdiction over the subject matter of this Agreement, such provision shall be deemed to be rescinded or modified in accordance with any such law, rule or

regulation. In all other respects, this Agreement shall continue to remain in full force and effect.

**26. Headings.** The headings of the provisions hereof are for descriptive purposes only and shall not modify or qualify any of the rights or obligations set forth in such provisions.

**27. Telephone Conversations.** For the protection of you and Bear Stearns, and as a way of correcting misunderstandings, you hereby authorize Bear Stearns, at its discretion and without prior notice to you, to monitor and/or record any or all telephone conversations between you and any of Bear Stearns' employees or agents which may be used in connection with any dispute between the parties or in any other way related to this Agreement.

**28. Other Agreements; Additional Rights.** The rights and remedies granted herein to Bear Stearns are in addition to any other rights and remedies, and supersede any limitation on or any requirement or condition for the exercise of such rights and remedies that are inconsistent herewith, which arise under any other Activity you may have with any Bear Stearns entity (including, without limitation, any requirement that time elapse or notice be given after your failure to perform any Obligation or any other default under any Activity, prior to the exercise of remedies under such other Activity). With respect to matters other than rights and remedies, the provisions of this Agreement shall supersede any inconsistent provision of any other Activity to the extent that the subject matter is dealt with in this Agreement if and to the extent the provision of such other Activity would deny any Bear Stearns entity any benefit or protection it is afforded under this Agreement. With respect to inconsistent provisions regarding resolution of disputes, including provisions for submission to jurisdiction or with respect to arbitration, this Agreement shall govern. Notwithstanding the foregoing, any provision of any Activity in writing and binding on Bear Stearns which is inconsistent with this Agreement and which other Activity states expressly that it is to supersede this Agreement (a merger clause shall not in and of itself be deemed such an express provision), shall govern. Except as provided above, the terms of any other applicable Activity shall continue in full force and effect. The provisions of this Agreement shall supersede any prior Institutional Account Agreement entered into by and between you and Bear Stearns.

**29. Characterization of Transfers, Obligations and Payments.** You hereby acknowledge that each transfer of Collateral and each payment hereunder and under any Activity is a "margin payment", "settlement payment" and "transfer" within the meaning of Sections 101, 362 and 546 of the Code, and each Obligation hereunder and under any Activity is an obligation to make a "margin payment," "settlement payment" and "payment" within the meaning of Sections 101, 362 and 560 of the Code.

**30. Representations.** By signing this Agreement, you represent and covenant (and you will be deemed to have repeated each representation and covenant, at the time of entering into each Activity) that: (a) you will engage in all Activities as principal and accordingly, you will determine the appropriateness of any of such Activities and address any legal, tax or accounting considerations applicable to you; (b) you will provide us with monthly financial statements by the 20th day of the month following the end of each month and you will immediately notify Bear Stearns of any material change in your financial condition; (c) you are knowledgeable of and experienced in the risks of entering into Activities you engage in, are capable of evaluating the merits and risks of Activities and are able to

8

bear their economic risks; (d) you are authorized to enter into this Agreement and each Activity to which this Agreement relates and perform your obligations hereunder and thereunder and that the Agreement is a legal, valid, binding and enforceable Obligation of yours except as enforceability may be limited by bankruptcy, moratorium on payment of debt or other laws affecting the rights of creditors generally; (e) the person who is executing this Agreement on your behalf is duly authorized to sign this Agreement in its name; (f) no advice furnished by Bear Stearns shall form a primary basis for any decision by you, except as provided below in (g) and no amounts paid by you to Bear Stearns shall be attributable to any advice provided by Bear Stearns; (g) Bear Stearns is not a fiduciary or adviser with respect to you unless we have agreed otherwise in a written agreement under which we receive compensation specifically identified as consideration for Bear Stearns acting as a fiduciary or adviser; (h) unless you expressly advise Bear Stearns to the contrary, you hereby represent that you are not an affiliate (as defined in Rule 144(a)(1) of the Securities Act of 1933) of the issuer of any security held in any of your accounts and (i) at all times, none of your assets constitute, directly or indirectly, plan assets subject to the fiduciary responsibility sections of the Employee Retirement Income Security Act ("ERISA") and you covenant to notify Bear Stearns immediately, if at any time, any of your assets become subject to the fiduciary responsibility sections of ERISA and, upon Bear Stearns' request, to terminate any or all Activities if your assets become subject to the fiduciary responsibility sections of the Employee Retirement Income Security Act ("ERISA")

In addition, by signing this Agreement, you represent and covenant (and you will be deemed to have repeated each representation and covenant, at the time of entering into each Activity) that you shall not use the name of Bear Stearns nor make any disclosure with respect to our relationship with you including, without limitation, in any disclosure document, solicitation, marketing or advertising material, or in any filing, without our prior written consent.

**31. Guaranteed Accounts.** You acknowledge that if your account is guaranteed by a third party, we are under no obligation to seek recovery under any such guarantee or from any third party.

**32. ADDITIONAL REPRESENTATION BY BORROWERS FROM BEAR STEARNS GLOBAL LENDING LIMITED, BEAR, STEARNS INTERNATIONAL LIMITED AND OTHER NON-US AFFILIATES OF BEAR STEARNS.**

By signing this Agreement, you further represent that you are neither a United States person nor a foreign person controlled by or acting on behalf of or in conjunction with United States persons as those terms are used in connection with Regulation X and that you are not a U.S. borrower subject to Regulation X promulgated by the Board of Governors of the Federal Reserve System. You shall be deemed to have repeated this representation each time you borrow funds and undertake to promptly notify us in writing if you should hereafter become subject to Regulation X. A copy of Regulation X has been delivered to you for your reference.

**33. On-Line And Electronic Systems.** If you or any of your employees or agents access or use any internet site or on-line or other electronic system operated for or by us or any account access, trading, order entry or other services, systems, capabilities or market or other data or content available through any of the foregoing (each, an "Electronic Service"), you acknowledge and agree that such ELECTRONIC SERVICE IS BEING MADE AVAILABLE TO

YOU OR SUCH OTHER PERSON WITHOUT ANY WARRANTY WHATSOEVER, EITHER EXPRESS OR IMPLIED, and you agree that any such access or use will be solely at your own risk, and neither we nor any vendor or source will have any liability whatsoever relating to or arising out of any such access or use or any inaccuracies, errors, delays, omissions or other problems with or failures of any Electronic Service. Moreover, you agree that if you or any of your employees or agents are given any digital certificate(s), user name(s) and/or password(s) which may be required to access or use any Electronic Services (collectively, "User Code(s)"), (a) you shall take all necessary actions to preserve the confidentiality of such User Codes; (b) you shall restrict access to the User Codes to those persons who are duly authorized to act on your behalf; (c) you shall notify us immediately in the event any such User Code is lost, stolen or, the confidentiality of any such User Code has been compromised in any way or the authority of any person to act on your behalf has been revoked or limited; and (d) you are responsible for and will be bound by all statements made, orders entered, and instructions, trades, agreements, assents and consents communicated under any such User Code, to the same extent that the same was under your duly signed writing.

**BY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE THAT:**

1. THE SECURITIES IN YOUR MARGIN ACCOUNT(S) AND ANY SECURITIES FOR WHICH YOU HAVE NOT FULLY PAID, TOGETHER WITH ALL ATTENDANT OWNERSHIP RIGHTS, MAY BE USED BY BEAR STEARNS AS MORE SPECIFICALLY SET FORTH IN PARAGRAPH 18 ABOVE; AND

2. THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 24.

[Executed as a deed by and on behalf of:]

**INSTITUTIONAL CLIENT** *(please complete):*

_Amerindo Management Inc._
Name of Institution

_399 Park Avenue_
Street Address

_New York_
City

_New York  10022_
State and Zip Code

_(212) 371 - 6988_
Facsimile Number

By: _Gary Tanaka_

_Gary Tanaka,  Executive VP_
Name and Title of Authorized Officer

Date: _3/6/02_

By:_____

9

Authorized Agent under Paragraph 24(d):

_David Mainzer_
Name

_399 Park Avenue  NY, NY  10022_
Address

_(212) 371-6360_
Telephone Number

The Bear Stearns Companies Inc., Bear, Stearns & Co. Inc., Bear, Stearns Securities Corp., Bear, Stearns International Limited, Bear Stearns Capital Markets Inc., Bear Stearns Capital Markets Inc. II, Bear Stearns Mortgage Capital Corporation, Bear, Stearns Funding, Inc., Bear Stearns Home Equity Trust, Bear Stearns N.Y., Inc., Bear Stearns Bank plc, Bear Stearns Global Asset Trading, Ltd., Bear Stearns Global Asset Holdings, Ltd., Bear Stearns Forex Inc., EMC Mortgage Corporation, Bear Stearns (Japan), Ltd., Bear Stearns Asia Limited and Bear Stearns Hong Kong Limited and any other Affiliate of a Bear Stearns entity that is a party hereto pursuant to Paragraph 1 hereof.

By: _John Ellanan_

Bear Stearns Global Lending Limited

By:_____

SUPPLEMENT TO INSTITUTIONAL ACCOUNT AGREEMENT
REGARDING SPECIAL CLEARING TRANSACTIONS

The terms and conditions hereof (the "Supplement") shall supplement and become part of the Institutional Account Agreement (the "IAA") to which this Supplement is attached. Together, this Supplement and the IAA shall govern transactions referred to herein as "Special Clearing Transactions", each of which shall be deemed both a "Clearing Transaction" and an "Activity", as defined in the IAA. Capitalized terms used without definition herein shall have the meanings ascribed to them in the IAA.

**1.     Special Clearance; Trade Processing. Securities.** Upon your request, Bear, Stearns & Co. Inc. itself or through its affiliate Bear, Stearns Securities Corp. or another Bear Stearns designee (any of the foregoing, "BSC") may, in its sole discretion, issue the letter attached hereto substantially in the form of Schedule I (the "Letter") to each of your trading counterparties that is approved by BSC (each, a "Counterparty" and each Clearing Transaction that is subject to a Letter shall be referred to herein as a "Special Clearing Transaction").

It is agreed that you shall be the party in interest for each Special Clearing Transaction entered into with a Counterparty pursuant to a Letter, and you shall bear any and all risks related to such Special Clearing Transaction, including but not limited to non-performance by a Counterparty. Furthermore, you agree that you shall timely provide to BSC any securities or money required for BSC to complete such transaction and to satisfy any demand for margin made by a Counterparty on BSC in respect of a Special Clearing Transaction.

You agree to report all Special Clearing Transactions executed before 4:00 p.m. (New York time) to BSC's Special Customers Operations Support Desk within one hour of execution and all Special Clearing Transactions executed between 4:00 p.m. and 5:00 p.m. (New York time) to such desk within fifteen (15) minutes of execution. BSC may decline Special Clearing Transactions reported after such times. Special Clearing Transactions executed and reported after 5:00 p.m. (New York time) may be processed the next business day. You agree to be responsible for any costs associated with any fail resulting from late reporting, which may include a one day, 50 basis point surcharge to finance the Special Clearing Transaction and a $100 late fee.

**2.     Repurchase Transactions with Third Parties.** If BSC and you have agreed and you request that BSC clear and settle repurchase transactions and/or reverse repurchase transactions that you may execute with third party dealers involving securities, you agree that: (a) each such repurchase and/or reverse repurchase transaction shall be deemed a "Clearing Transaction" and an "Activity", as defined in the IAA, (b) you will notify BSC of the Details (as defined below) of the repurchase and/or reverse repurchase transactions in accordance with the time schedule agreed to by you and BSC, but in no event later than 12:00 p.m. (New York time) on the day of execution, (c) you shall be the party in interest for such Clearing Transaction and you shall bear all the risks related to such Clearing Transaction including but not limited to, non-performance by the third party dealer and (d) you will provide BSC the necessary securities or cash, as the case may be, to enable BSC to process, clear and settle the delivery of the securities and cash related to such transactions, including any cash or securities necessary to meet a demand for margin made by the third party dealer. The term "Details" shall mean the specific third party dealer, the department at the specific third party dealer, the purchase/settlement date, the purchase or sale price, the purchased securities, the pricing rate, and the repurchase date.

You shall not, under any circumstances represent to any third party dealer that any Bear Stearns entity acts as guarantor of any repurchase or reverse repurchase transactions you execute with such third party dealer.

3.    **Collection of Principal and Interest Payments.** BSC will receive payments of principal and interest due and payable on or on account of securities held by BSC in your account. BSC shall not, however, be responsible to (a) claim payments of principal and interest due and payable with respect to fed wireable securities that are the subject of repurchase or reverse repurchase transactions with third party dealers or (b) enforce collection, by legal means or otherwise, of any payments of principal and/or interest not paid when due.

4.    **Pricing.** If and to the extent any pricing information related to securities in any of your accounts (a "pricing estimate") is included in any report or file that is provided to you, the pricing estimate will be provided solely for evaluative purposes and not for trading purposes and will be based on prices that are generated by BSC's pricing system. Such pricing estimates may (a) not reflect the actual market value of the securities, (b) vary from the value BSC may assign to any such securities in other circumstances and (c) not take into account the size of the position you have in the securities. As a condition to providing you with pricing estimates, you represent, warrant and covenant to BSC that you (i) will use the pricing estimates provided by BSC in combination with pricing estimates obtained from other sources, (ii) will not use the pricing estimates to determine the net asset value of any fund, (iii) will not, at any time without the prior written consent of BSC, disclose or reveal the pricing estimates to any person or entity, other than to those of your officers and employees who are required in the course of their duties with respect to the securities to access the same and who shall be required by you to observe the same restrictions on the use of the pricing estimates as are contained in this Supplement, and (iv) have the policies and procedures in place necessary to comply with the restrictions on use related to the pricing estimates and the terms of this Supplement.

5.    **Fees.** From time to time, BSC and you will agree on compensation to be paid with respect to Special Clearing Transactions or Clearing Transactions. BSC reserves the right to impose minimum fees on inactive accounts.

6.    **MBSCC.** In the event that BSC establishes an MBSCC subaccount for you, BSC will pass on to you all MBSCC fees that are related to such subaccount.

7.    **Non-Waiver.** For the avoidance of doubt and as set forth in the IAA, BSC may decline to clear or settle any Special Clearing Transaction or any Clearing Transaction if it determines, in its sole discretion, that such transaction poses unacceptable risk. For the avoidance of doubt nothing contained in this Supplement shall constitute a waiver by Bear Stearns of any of its rights under the IAA.

_Amerindo Management Inc._
Name of Institution

_Gary Tanaka, Executive VP_
Name and Title of Authorized Officer

Signature of Authorized Officer

_3/6/02_
Date

Bear, Stearns & Co. Inc.
Name of Institution

Name and Title of Authorized Officer

Signature of Authorized Officer

Date

G:\Forms\Agreements\IAA\IAA-AND

SUPPLMNTS09721/01doc

12

## SUPPLEMENT TO INSTITUTIONAL ACCOUNT AGREEMENT
## REGARDING PRIME BROKERAGE SERVICES

The following shall supplement and form part of the attached Institutional Account Agreement (the "Agreement") and shall set forth the terms and conditions under which Bear Stearns will provide prime brokerage services to you. Notwithstanding the foregoing or anything else contained in this Supplement, this Supplement shall not apply to Activities that constitute clearance services to you for transactions executed away from Bear Stearns involving securities which are processed and cleared through accounts whose account number begins with "021" as such accounts may be supplemented or amended from time to time ("Special Clearing Transactions"). In the event of any uncertainty or dispute, Bear Stearns shall determine whether a transaction is a Special Clearing Transaction. All defined terms in the Institutional Account Agreement shall have the same meanings in this Supplement as they have in the Institutional Account Agreement.

1. The term "Activity" shall also mean Prime Brokerage transactions, as described below.

2. Prime Brokerage Services

(a) Prior to the commencement of any prime brokerage activity, Bear Stearns will enter into an agreement with your executing broker(s) that will set forth the terms and conditions under which your executing broker(s) will be authorized to accept orders from you for settlement by Bear Stearns (the "Prime Brokerage Agreement"). Bear Stearns will accept for clearance and settlement trades executed on your behalf by such executing broker(s) as you may designate from time to time. On the day following each transaction, Bear Stearns will send you a notification of each trade placed with your executing broker based upon the information provided by you. This notification contains some but not all of the information required to appear in a confirmation. Your executing broker is responsible for delivering to you a confirmation of each trade executed and settled on your behalf.

(b) Subject to paragraph 10 of the Agreement, Bear Stearns shall be obligated to settle trades executed on your behalf by your executing broker(s) and reported to Bear Stearns by you and your executing broker(s) provided that you have reported to Bear Stearns promptly upon execution of the trade, but in no event later than 4:00 p.m. (New York time) on the trade date, or by such other time as Bear Stearns may advise you, all the details of such trades including, but not limited to, the contract amount, the security involved, the number of shares or the number of units and whether the transaction was a long or short sale or a purchase, and further provided that Bear Stearns has not "DK'd" ("indicated it does not know") and has not subsequently disaffirmed such trades. Upon Bear Stearns becoming obligated to settle a trade, you shall be responsible and liable to Bear Stearns for making the settlement payment (including the delivery of applicable securities) with respect to such trade. In the event that Bear Stearns determines not to settle a trade, Bear Stearns shall not have settlement responsibility for such trade and shall, instead, send you a cancellation notification to offset the notification sent to you under sub-paragraph (a) of this paragraph. In the event that Bear Stearns determines not to settle a trade, you shall be solely responsible and liable to your executing broker(s) for settling such trade. In addition, Bear Stearns may be required to cease providing prime brokerage services to you in accordance with the Prime Brokerage Agreement.

(c) In the event of: (i) the filing of a petition or other proceeding in bankruptcy, insolvency or for the appointment of a receiver by or against your executing broker, (ii) the termination of your executing broker's registration and the cessation of business by it as a broker-dealer, or (iii) your executing broker's failure, inability or refusal, for any reason whatsoever or for no reason at all, to settle a trade, if Bear Stearns agrees to settle any trades executed on your behalf by such executing broker, regardless whether Bear Stearns did not DK and did not disaffirm such trades, you shall be solely responsible, and liable to Bear Stearns, for any losses arising out of or incurred in connection with Bear Stearns' agreement to settle such trades.

13

(d) You shall maintain in your account with Bear Stearns such minimum net equity in cash or securities as Bear Stearns, in its sole discretion may require, from time to time (the "Bear Stearns Net Equity Requirements"), which shall in no event be less than the minimum net equity required by the SEC Letter, as defined in sub-paragraph (g) of this paragraph (the "SEC Net Equity Requirements"). In the event your account falls below the SEC Net Equity Requirements, you hereby authorize Bear Stearns to notify promptly all executing brokers with whom it has a Prime Brokerage Agreement on your behalf of such event. Moreover, if you fail to restore your account to compliance with the SEC Net Equity Requirements within the time specified in the SEC Letter, Bear Stearns shall: (i) notify all such executing brokers that Bear Stearns is no longer acting as your prime broker and (ii) "DK" all prime brokerage transactions on your behalf with trade date after the business day on which such notification was sent. In the event either: (i) your account falls below the Bear Stearns Net Equity Requirements, (ii) Bear Stearns determines that there would not be enough cash in your account to settle such transactions or that a maintenance margin call may be required as a result of settling such transactions, or (iii) Bear Stearns determines that the continuation of prime brokerage services to you presents an unacceptable risk to Bear Stearns taking into consideration all the facts and circumstances, Bear Stearns may disaffirm all your prime brokerage transactions and/or cease to act as your prime broker.

(e) If you have instructed your executing broker(s) to send confirmations to you in care of Bear Stearns, as your prime broker, the confirmation sent by such executing broker is available to you promptly from Bear Stearns, at no additional charge.

(f) If your account is managed on a discretionary basis, you hereby acknowledge that your prime brokerage transactions may be aggregated with those of other accounts of your advisor, according to your advisor's instructions, for execution by your executing broker(s) in a single bulk trade and for settlement in bulk by Bear Stearns. You hereby authorize Bear Stearns to disclose your name, address and tax ID number to your executing broker(s). In the event any trade is disaffirmed, as soon as practicable thereafter, Bear Stearns shall supply your executing broker(s) with the allocation of the bulk trade, based upon information provided by your advisor.

(g) The prime brokerage services hereunder shall be provided in a manner not inconsistent with the no-action letter dated January 25, 1994 issued by the Division of Market Regulation of the Securities and Exchange Commission (the "SEC Letter"), and any supplements or amendments thereto.

This Supplement is dated as of the _6_ of _March_, 200_7_

_Amerindo Management Inc._
[NAME OF ACCOUNT]

By: _____

Name: _Gavy Tanaka_

Its: _Executive VP_

UPDATED DOCUMENT

Date: _11/05/02_

## Certificate of Corporate Secretary
### Brokerage Account and Trading Resolutions

I, _Gary Tanaka_, being the Secretary of _Amerindo Management Inc._, duly organized and validly existing under the laws of _Panama_, and having a principal place of business at _44 Upper Grosvenor Street London, England_ (the "Corporation"), hereby certify that, at a meeting of the Board of Directors of the Corporation duly held on the _6th_ day of _March_, _2001_ _____, the following Resolutions were duly adopted and are now in full force and effect:

Opening of Brokerage Account(s); Conducting Transactions

RESOLVED, that the Corporation is hereby authorized and directed to establish and maintain one or more accounts (including margin accounts) (each, an "Account"), and to engage in any of the transactions hereinafter described, with or through, Bear, Stearns & Co. Inc., Bear, Stearns Securities Corp., Bear, Stearns International Limited and/or any of their now or hereafter existing affiliated entities (collectively, "Bear Stearns"), through an Account or otherwise. Bear Stearns is authorized to act as principal or agent in such transactions;

Trading Authority *

RESOLVED, that the Corporation is hereby authorized and empowered to purchase (including on a forward or when-issued basis or on margin), hold, finance, pledge, exercise, convert, tender, redeem, exchange, transfer, assign, sell (including short, when-issued and forward sales), enter into, write, issue, terminate, amend and otherwise deal and trade, singly or in combination, in the following:

- Securities (General): any and all forms of securities, trust certificates, evidences of interest, participation or indebtedness of any kind whatsoever, whether publicly registered or exempt from registration, for example as a private placement or exempt security, including without limitation, the securities, instruments and transactions listed in the categories set forth below;

- Debt Securities: any and all forms of bonds, debentures or notes of any coupon (including "zero coupon") or maturity, including, but not limited to, obligations issued or guaranteed by the United States government or any of its agencies or instrumentalities, Government Sponsored Enterprises (including, but not limited to, Fannie Mae, Freddie Mac, the Federal Farm Credit Banks Funding Corporation, the Federal Home Loan Banks and Sallie Mae), foreign sovereign nations, corporations or other entities, including special purpose entities, whether investment grade, unrated, high-yield, secured or unsecured;

- Equity Securities: any and all forms of common and preferred stock, scrip, warrants and rights;

- Mortgages, Mortgage-Backed, Asset-Backed and other Structured Securities: whole mortgage loans and interests and participations in mortgage loans, whether residential, commercial or multi-family; mortgage-backed, mortgage-related or mortgage-derived securities or instruments of any kind whatsoever including, but not by way of limitation, any tranches of collateralized mortgage obligations, REMICs, mortgage pass-through certificates and participation certificates, whether issued or guaranteed by or backed by collateral of a government agency, Government Sponsored Enterprise or a private issuer, including, but not limited to, planned or targeted amortization, interest-only, principal-only, floating rate, inverse floating rate or zero coupon classes, interest-only or principal-only strips or mortgage residuals or any combination of the foregoing all forms and tranches of asset-backed securities, including, but not limited to, securities backed by auto, truck, boat, home equity, credit card loans, and any other form of consumer debt or business debt, lease payments, any form of bank debt or debt pass-through securities, and equity or other interests in and debt instruments issued by entities whose principal assets are any of the foregoing and any asset-backed residual;

- Repurchase, Reverse Repurchase, Securities Lending and Similar Transactions: repurchase and reverse repurchase transactions, securities lending, bonds borrow pledge, dollar rolls, buy forward sale and other similar transactions involving cash or any kind of security, asset-backed interest or participation or other financial instrument;

---

* SECURITIES OR TRANSACTIONS THAT ARE NOT AUTHORIZED HAVE BEEN CROSSED OUT.

- Money Market Instruments, Bank Notes and Bank Loans: money market instruments, including, but not limited to, bankers acceptances, certificates of deposit and commercial paper, deposit notes and other bank notes and corporate, commercial or sovereign loans or obligations;

- Foreign Exchange: spot and forward transactions in foreign currencies, currency futures contracts, and listed or over-the-counter options on foreign currencies;

- Commodities and Futures: commodities and financial futures contracts and listed and over-the-counter options on commodities and financial futures;

- Options and Certain Derivative Transactions: options and derivative transactions, including, but not limited to, any and all forms of listed or over-the-counter options, whether physical or cash settled, (whether or not "covered") on, and transactions whose performance is linked to, or derived from, individual groups or indices of bonds, notes or other evidences of indebtedness, equities, currencies, interest rates, commodities, financial instruments, or any other securities whether or not described in this resolution or any similar transaction or combination thereof whether on a forward basis or otherwise, including any option to enter into any of the foregoing;

- Interest Rate, Currency and Other Swap Transactions:  swap transactions, including, but not limited to, interest rate swaps, basis swaps, commodity swaps, rate protection transactions, interest rate futures, caps, collars, floors, corridors, and forward rate agreements, currency swap agreements, cross-currency rate swap agreements, total return swaps related to individual groups or indices of bonds, notes, or other evidences of indebtedness, equities, financial instruments or any other securities whether or not described in this resolution, transactions linked to the creditworthiness of one or more issuers or sovereigns or any similar transaction or combination thereof, whether on a forward basis or otherwise, including any option to enter into any of the foregoing;

- International Securities and Transactions: each of the above itemized securities, obligations, instruments and other transaction types may be dealt in regardless of whether such security, obligation, instrument or other transaction type is issued by, the obligation of, or related to, a foreign person, enterprise or sovereign, is denominated in a foreign currency or trades or is settled on or through a foreign market, exchange or clearinghouse; and

- Miscellaneous: any transaction that is similar to any of the transactions described above (including an option with respect to any of them), any combination of these transactions or any other transaction, whether or not described in this resolution.

Authorized Officers/Agents

RESOLVED, that each of the officers or agents of the Corporation listed below is hereby individually authorized for and on behalf of the Corporation (1) to give to and receive from Bear Stearns oral or written instructions, confirmations, notices or demands with respect to any Account or transaction; (2) to have complete authority at all times to bind the Corporation to enter into and perform any transaction or agreement, amendment or modification thereof, relating to any Account or transaction involving the Corporation; (3) to lend or borrow money or securities and to secure the repayment thereof with the property of the Corporation; (4) to pay in cash or by check or draft drawn upon the funds of the Corporation any sums required to be paid in connection with any Account or transaction; (5) to order the transfer or delivery of any securities, funds or other property to such officer or agent or to any other person; (6) to order the transfer of record of any securities, funds or other property to any name and to accept delivery of any securities, funds or other property; (7) to direct the sale or exercise of any rights with respect to any securities or other property; (8) to sign for and on behalf of the Corporation all agreements, confirmations, releases, assignments, powers of attorney or other documents in connection with any Account or transaction; (9) to agree to any terms or conditions or to execute any document or agreement affecting any Account or transaction; (10) to endorse any securities or other property in order to pass title thereto (or to any interest therein); (11) to direct Bear Stearns to surrender any securities or other property for the purpose of

effecting any exchange or conversion thereof or otherwise; (12) to appoint any other person or persons to do any and all things which such officer or agent is hereby empowered to do and (13) generally, to take all such action as such officer or agent may deem necessary or desirable to implement or facilitate the trading activities authorized in the preceding Resolutions.

| Name of Officer/Agent | Title/Firm Name | Specimen Signature |
|---|---|---|
| Gary Tanaka | Director | |
| Alberto Vilar | Director | |
| | | |
| | | |

RESOLVED, that the Corporation hereby agrees to indemnify and hold each Bear Stearns entity and all of their respective successors, affiliates, assigns, officers, directors and employees, (the "Indemnified Parties") harmless from, and to pay the Indemnified Parties promptly on demand any and all losses, liabilities, damages, claims, costs or expenses (including attorneys' fees and expenses) incurred in connection with their reliance on the terms of these Resolutions, including any debit balance in the Corporation's Account(s). This authorization and indemnity is in addition to (and in no way limits or restricts) any rights which any of the Indemnified Parties may have under any other agreement(s) between the Corporation and any of the Indemnified Parties.

Effectiveness of Resolutions

RESOLVED, that the foregoing Resolutions shall apply to all transactions and agreements between the Corporation and Bear Stearns, even if such transactions and agreements were entered into by the Corporation and Bear Stearns prior to the adoption of such Resolutions (which prior transactions and agreements with Bear Stearns are hereby ratified in all respects) and shall remain in full force and effect until the close of business on the second business day after Bear Stearns receives written notice of the modification or revocation thereof at its offices located at 245 Park Avenue, New York, New York 10167, Attn: Senior Managing Director, Global Credit Department, or any other successor address which has been provided to you.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the Corporation to be affixed on this _____6th_____ day of _March_, 20 _02_.

_____
Secretary

[CORPORATE SEAL]

# OPTIONS INFORMATION FORM AND AGREEMENT

Account # **102 - 0148S**

Dear Client:

Exchange rules require us to request the following information from all customers who intend to effect transactions in options. The information is intended to assist us in making recommendations that are appropriate to your investment objectives. We would appreciate your completing the form. Bear Stearns Securities may, on the basis of the information provided, decline to accept any account for options activity or may limit such account to specific activities.

IF ACCOUNT IS IN NAME OF MORE THAN ONE INDIVIDUAL, PLEASE SUPPLY INFORMATION FOR ALL OWNERS.

OCCUPATION _____ EMPLOYER _____

TYPE OF BUSINESS _____ YEARS THERE _____

AGE ____ MARITAL STATUS _____ DEPENDENTS _____

APPROXIMATE INCOME _____ SPOUSE'S INCOME _____

APPROXIMATE NET WORTH $ _____ APPROXIMATE LIQUID NET WORTH $ _____
(Do not include residence)

**CHECK BOX**

| | HIGH | MODERATE | LIMITED |
|---|---|---|---|
| PAST INVESTMENT EXPERIENCE (Years) | | | |
| STOCKS/BONDS | 10 | | |
| OPTIONS | 20 | | |
| COMMODITIES | | | |

OTHER INVESTMENTS: ☐ REAL ESTATE ☐ TAX SHELTERS ☐ SAVINGS
☐ INCOME ☐ GROWTH

INVESTMENT OBJECTIVES:
| ACTIVITY/INCOME | | |
|---|---|---|
| | LIMITED | MODERATE | EXTENSIVE |

INVESTORS SHOULD NOT PURCHASE PUT OR CALL OPTIONS UNLESS THEY ARE TO EMPLOY A TOTAL LOSS OF THEIR SUBSTANTIAL FINANCIAL LOSS, OR WHICH UNCOVERED OPTIONS UNLESS THEY ARE ABLE TO SUSTAIN SUBSTANTIAL FINANCIAL LOSS.
PLEASE CHECK (SELECT) ONE OR MORE OF THE OPTION STRATEGIES YOU MAY WISH TO EMPLOY:

COVERED CALL WRITING ☒

PUT/CALL SPREADS/CALL BUYS (SPECULATIVE) ☒

PUT WRITING (SPECULATIVE) ☒

UNCOVERED CALL WRITING
(THIS IS A HIGHLY SPECULATIVE ACTIVITY)
IF YOU ARE AN EXPERT, PLEASE SIGN THIS FORM OF THE BOTTOM RIGHT HAND SIDE AFTER READING THE AGREEMENT. THANK YOU.

Date _3/15/05_     R.R. Signature _____

Date _____   Approved Equity Options _____

Date _____   Approved for Currency Options _____

Date _____   Approved Int. Rate Options _____

Date _____   Approved _____

Date _3/15/05_     _____
Date disclosure document sent     Registered options principal

Date statement of risk for uncovered
Options written sent

3AS (REV. 11/93)

[stamp] COMPLIANCE



DOCUMENTATION DEPARTMENT USE ONLY - DO NOT WRITE IN THIS AREA - DOC CON NO

Account No. __102-01485__

## FORM OF CORPORATE RESOLUTIONS
## TO BE RECEIVED BY BEAR STEARNS

Corporate Account

__Amerindo Management Inc.__ (the "Corporation"), by its President,
(Name of Corporation)

pursuant to the resolutions, a copy of which, certified by the Secretary, is annexed hereto, hereby authorizes Bear, Stearns & Co. Inc. ("Bear Stearns") to open an account in the name of the Corporation. This authorization shall continue in force until revoked by the Corporation by a written notice, addressed to Bear Stearns and delivered at its office at 55 Water Street, New York, New York, 10041, Attention: Director, Legal & Compliance Department. No such revocation shall effect in any manner Bear Stearns' rights under these resolutions and indemnity with respect to any obligation arising prior to your actual receipt of such written notice of revocation.

Very truly yours,

Name of Corporation

__Amerindo Management Inc.__

By: __Maria E. Dichov, Secretary__
(Name and Title)

I, __Maria E. Dichov__ being the Secretary of
(Name of Secretary)

__Amerindo Management Inc.__, the "Corporation"), hereby certify that the
(Name of Corporation)

resolutions set forth below were duly adopted at a meeting of the Board of Directors of the Corporation, duly held on the __fifth__ day of __November__, 19 __87__, at which a quorum of said Board of Directors was present and acting throughout and that no action has been taken to rescind or amend said resolutions and that the same are now in force and effect.

I further certify that each of the following has been duly elected and is legally holding the office set forth opposite his name:

| | |
|---|---|
| Albert W. Vilar | , President |
| Gary A. Tanaka | , Vice-President |
| B.C. Fong | , Treasurer |
| M.E. Dichov | , Secretary |

I further certify that the Corporation is duly organized and existing and has the power to take the action called for by the resolutions annexed hereto.

**IN WITNESS WHEREOF,** I have hereunto affixed my hand this __fifth__ day of __November__, 19 __87__.

_____
(Secretary)

2040-409 11/03

**10. IMPARTIAL LOTTERY ALLOCATION.** You agree, that in the event Bear Stearns holds on your behalf bonds or preferred stocks in street or bearer form which are callable in part, you will participate in the impartial lottery allocation system of the called securities in accordance with the rules of the New York Stock Exchange, Inc. Further you understand when the call is favorable no allocation will be made to any account in which Bear Stearns, its partners or employees have financial interest until all other customers are satisfied on an impartial lottery basis.

**11. WAIVER, ASSIGNMENT AND NOTICES.** No term or provision of this Agreement may be waived or modified unless in writing and signed by the party against whom such waiver or modification is sought to be enforced. Bear Stearns' failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereunder or any continued course of such conduct on its part shall in no event constitute or be considered a waiver by Bear Stearns of any of its rights or privileges. This Agreement contains the entire understanding between you and Bear Stearns concerning the subject matter of this Agreement. You may not assign your rights and obligations hereunder without first obtaining the prior written consent of Bear Stearns. Notice or other communication including margin calls delivered or mailed to the address given below shall, until Bear Stearns has received notice in writing of a different address, be deemed to have been personally delivered to you.

**12. NEW YORK LAW TO GOVERN.** This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights and liabilities of the parties determined, in accordance with the laws of the State of New York.

**13. ARBITRATION.** It is understood that the following agreement to arbitrate does not constitute a waiver of the right to seek a judicial forum where such a waiver would be void under the federal securities laws.

The undersigned agrees, and by carrying an account for the undersigned you agree, that except as inconsistent with the foregoing sentence, all controversies which may arise between us concerning any transaction or the construction, performance or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration in accordance with the rules,

then in effect, of the National Association of Securities Dealers, Inc., the Board of Governors of the New York Stock Exchange, Inc. or the Board of Governors of the American Stock Exchange, Inc. as you may elect. If you do not make such election by registered mail addressed to Bear Stearns at 55 Water Street, New York, New York 10041, Attention: Director Legal and Compliance Department, within five days after demand by Bear Stearns that you make such election, then Bear Stearns may make such election. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

**14. PARTIAL UNENFORCEABILITY.** If any provisions herein are or should become inconsistent with any present or future law, rule or regulation of any sovereign government or a regulatory body having jurisdiction over the subject matter of this Agreement, such provision shall be deemed to be rescinded or modified in accordance with any such law, rule or regulation. In all other respects, this Agreement shall continue and remain in full force and effect.

**15. MARGIN IN MARGIN ACCOUNTS (NOT APPLICABLE TO CASH ACCOUNTS).** You hereby agree to maintain such margins in your margin account as Bear Stearns may in its discretion require and you agree to pay forthwith on demand any debit balance owing with respect to any of your margin accounts, and if not paid this shall be a breach of this Agreement and Bear Stearns may take such action as it considers necessary for its protection in accordance with this Agreement. You will be charged interest on your debit balance which if not paid at the close of an interest period will be added to the opening balance for the next interest period. Please consult the Truth-in-Lending disclosure statement for an outline of Bear Stearns' margin policies.

**16. CUSTOMER'S CONSENT TO LOAN OR PLEDGE OF SECURITIES (NOT APPLICABLE TO CASH ACCOUNTS).** You hereby authorize Bear Stearns to lend either to itself or to others any securities held by Bear Stearns in your margin account and to carry all such property in its general loans and such property may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other such property for any amounts due to Bear Stearns thereon or for a greater sum, and Bear Stearns shall have no obligation to retain a like amount of similar property in its possession and control.

BY SIGNING THIS AGREEMENT YOU ACKNOWLEDGE THAT THE SECURITIES IN YOUR MARGIN ACCOUNT MAY BE LOANED TO BEAR STEARNS OR LOANED OUT TO OTHERS

IF JOINT ACCOUNT BOTH PARTIES MUST SIGN

Persons signing on behalf of others please indicate title or capacity in which you have signed

AMERINDO MANAGEMENT INC.
Sub Account M26
(Typed or Printed Name)

X _____
(Signature)

Albert W. Vilar
(Typed or Printed Name)

X _____
(Signature)

c/o Amerindo Investment Advisors, Inc.
17A Curzon Street,
LONDON W1Y 7FE, England
(Mailing Address)

Acct. No. 102-01485

Date 1st September 1987

EXHIBIT F

# J.P.Morgan

OFFICE SERVICING YOUR ACCOUNT
J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York  10179
(212) 270-6000

Month End Closing Method: FIFO

AMERINDO MANAGEMENT INC

| | |
|---|---|
| STATEMENT PERIOD | March 1, 2012 |
| THROUGH | March 30, 2012 |
| ACCOUNT NUMBER | 102-01485 MOT |
| TAXPAYER NUMBER | Not Applicable |
| LAST STATEMENT | December 30, 2011 |

AMERINDO MANAGEMENT INC
SUB ACCOUNT M26
C/O CITITRUST (BAHAMAS) LTD
ATTN: MICHAEL R FIELDS
PO BOX N 1576-THOMPSON BLVD
NASSAU BAHAMAS

## What's In This Statement

| | |
|---|---|
| Financial Summary | 3 |
| Your Portfolio Holdings | 5 |
| Your Messages | 6 |

## Market Value of Your Portfolio



| | |
|---|---|
| Cash & Money Mkt Fds | $384,780 |
| | $384,780 |
| Equities | $722,568 |
| | $569,296 |

■ Current market value
□ Last statement's market value

## Your Portfolio at a Glance

| | |
|---|---|
| TOTAL VALUE OF SECURITIES THIS PERIOD | 722,568 |
| NET CREDIT BALANCE | 384,780 |
| NET EQUITY THIS PERIOD | $1,107,348 |
| NET EQUITY LAST STATEMENT | 954,076 |
| CHANGE SINCE LAST STATEMENT | 153,272 |

*This portfolio includes one or more unpriced securities that are not reflected in the Total Value of Securities and the Net Equity This Period.

There are no "Stop Loss" orders or other pending buy or sell open orders on file for your account.

SIPC This summary is for informational purposes only. It is not intended as a tax document. This statement should be retained for your records. See reverse side for important information.

CLEARING AGENT: J.P. MORGAN CLEARING CORP
3 CHASE METROTECH CENTER, BROOKLYN, NY 11245

AMERINDO MANAGEMENT INC

STATEMENT BACKER IS PRINTED ON THIS PAGE

# J.P.Morgan

OFFICE SERVICING YOUR ACCOUNT
J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York  10179
(212) 270-6000

AMERINDO MANAGEMENT INC

| STATEMENT PERIOD | March 1, 2012 |
| THROUGH | March 30, 2012 |
| ACCOUNT NUMBER | 102-01485 MOT |
| TAXPAYER NUMBER | Not Applicable |
| LAST STATEMENT | December 30, 2011 |

## Portfolio Value

| Assets | THIS PERIOD | LAST PERIOD |
|---|---|---|
| Net Credit Balance | 384,779.53 | 384,779.53 |
| Equities | 722,568.00 | 569,296.00 |
| Total Assets | $1,107,347.53 | $954,075.53 |
| NET PORTFOLIO VALUE | $1,107,347.53 | $954,075.53 |

## Cash Flow Analysis

| | THIS PERIOD | THIS YEAR |
|---|---|---|
| Opening Cash/Sweep Prog. | $384,779.53 | $384,779.53 |
| Closing Cash/Sweep Prog. | $384,779.53 | $384,779.53 |

**Your Portfolio Allocation**



Cash & MMF 35%

Equities  65%

Unshaded portions denote debit balance and/or short market
values. The allocation percentage is derived from the absolute
market value of your portfolio.

J.P.Morgan

OFFICE SERVICING YOUR ACCOUNT
J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York  10179
(212) 270-6000

AMERINDO MANAGEMENT INC

STATEMENT PERIOD        March 1, 2012
THROUGH                 March 30, 2012

ACCOUNT NUMBER          102-01465 M0T
TAXPAYER NUMBER         Not Applicable
LAST STATEMENT          December 30, 2011

# J.P.Morgan

OFFICE SERVICING YOUR ACCOUNT
J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York 10179
(212) 270-6000

AMERINDO MANAGEMENT INC

| | |
|---|---|
| STATEMENT PERIOD | March 1, 2012 |
| THROUGH | March 30, 2012 |
| ACCOUNT NUMBER | 102-01465 MOT |
| TAXPAYER NUMBER | Not Applicable |
| LAST STATEMENT | December 30, 2011 |

5 of 7

## Your Portfolio Holdings

### CASH & MONEY MARKET FUNDS

| DESCRIPTION | TYPE | SYMBOL/CUSIP | QUANTITY | PRICE | MARKET VALUE | ESTIMATED ANNUAL INCOME | ESTIMATED YIELD (%) |
|---|---|---|---|---|---|---|---|
| CASH BALANCE | MRGN | | | | 384,780 | | |
| TOTAL CASH & MONEY MARKET FUNDS | | | | | $384,780 | | $0 |

### EQUITIES

### Equities & Options

| DESCRIPTION | SYMBOL/CUSIP | ACCT TYPE | QUANTITY | PRICE | MARKET VALUE | ESTIMATED ANNUAL INCOME | ESTIMATED YIELD (%) |
|---|---|---|---|---|---|---|---|
| SIRIUS XM RADIO INC | SIRI | MRGN | 312,800 | 2.3100 | 722,568 | | |
| ZEPHYR INTERNATIONAL INC NEW | ZPYR | MRGN | 1,000 | Unpriced | | | |
| Total Equities & Options | | | | | $722,568 | $0 | |
| TOTAL EQUITIES | | | | | $722,568 | $0 | |

| | |
|---|---|
| YOUR PRICED PORTFOLIO HOLDINGS | $1,107,348 |

# J.P.Morgan

OFFICE SERVICING  YOUR ACCOUNT
J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York  10179
(212) 270-6000

| | |
|---|---|
| STATEMENT PERIOD | March 1, 2012 |
| THROUGH | March 30, 2012 |
| ACCOUNT NUMBER | 102-01485 MOT |
| TAXPAYER NUMBER | Not Applicable |
| LAST STATEMENT | December 30, 2011 |

AMERINDO MANAGEMENT INC

## Your messages

 **Important Information For Clients Holding Restricted Securities:**
Restricted Securities (typically noted as "Restricted" or "RSTD" in the security description) have not been registered under the Securities Act of 1933 and may not be "freely traded." Since restricted securities are subject to certain restrictions which may render them illiquid or less liquid than freely-tradeable shares, there can be no assurance a secondary market exists. While we typically use the value of the registered/unrestricted security of the same issuer and same class for statement (and other) reporting purposes, the price realizable in a sale of the securities may be less than the "Market Value" indicated and could be zero. No attempt has been made to independently value the specific security subject to its restriction. Additionally, inclusion of pricing of these holdings will result in the aggregated value of your portfolio as reflected on this report being overstated by an amount equal to the difference (if any) between the value of the freely-traded underlying security and the actual value of your restricted shares. For additional information on pricing, please see "Market Prices" on the back of your account statement.

 Please report any difference or non-receipt
of checks or stocks, indicated as delivered to
you, to Client Services
at 800-634-1428; or
write to Client Services at J.P. Morgan
Clearing Corp. Three Chase Metrotech Center,
Brooklyn, N.Y.  11245-0001

 J.P. Morgan Securities LLC's (JPMS LLC) and J.P. Morgan Clearing Corp.'s (JPMCC) Net Capital and Net Capital Requirements

At December 31, 2011, JPMS LLC's net capital of $11.1 billion exceeded the minimum regulatory net capital requirement of $1.6 billion by $9.5 billion. JPMCC's net capital of $7.4 billion was approximately 7.7% of aggregate debit items and exceeded the minimum regulatory net capital requirement of $1.9 billion by $5.5 billion.

Complete copies of JPMS LLC's and JPMCC's individual audited Statement of Financial Condition may be obtained, at no cost, by accessing the following JPMorgan Chase & Co. website address:

http://investor.shareholder.com/jpmorganchase/financial-condition.cfm

Additionally, you may call the following toll-free phone number to request a hard copy of the statement: 1-866-576-1300.

 You are advised to promptly report any inaccuracy or discrepancy in your account to your broker and J.P. Morgan Clearing Corp. (JPMCC) at the telephone numbers listed on this statement. In order to protect your rights, including any rights under the Securities Investor Protection Act ("SIPA"), any such communications should be reconfirmed in writing to your broker and JPMCC at the addresses which appear on the front of this statement.

# J.P.Morgan

7 of 7

OFFICE SERVICING YOUR ACCOUNT
J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York 10179
(212) 270-6000

AMERINDO MANAGEMENT INC

| | |
|---|---|
| STATEMENT PERIOD | March 1, 2012 |
| THROUGH | March 30, 2012 |
| | |
| ACCOUNT NUMBER | 102-01485 MOT |
| TAXPAYER NUMBER | Not Applicable |
| LAST STATEMENT | December 30, 2011 |

## Your messages     (continued)



Important Information Regarding Auction Rate Securities (ARS). ARS are debt or preferred securities with an interest or dividend rate reset periodically in an auction. Although there may be daily, weekly and monthly resets, there is no guarantee that there will be liquidity. If there are not enough bids at an auction to redeem the securities available for sale, the result may be a failed auction. In the event of a failed auction, there is no assurance that a secondary market will develop or that the security will trade at par or any other price reflected on statements. Accordingly, investors should not rely on pricing information appearing in their statements with respect to ARS. Where J.P. Morgan Clearing Corp. was unable to obtain a price from an outside service for a particular ARS, the price column on your statement will indicate "unpriced."

****** End of Statement ******

STOP

EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

      -v-                              :

ALBERTO WILLIAM VILAR,            :
      a/k/a "Albert Vilar,"
GARY ALAN TANAKA,                 :

          Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**INDICTMENT**

S3 05 Cr. 621 (KMK)



**COUNT ONE**

(Conspiracy to Commit Securities Fraud, Investment Adviser Fraud,
Mail Fraud, Wire Fraud, and Money Laundering)

The Grand Jury charges:

**Relevant Persons and Entities**

    1.    At all times relevant to this Indictment, Amerindo Investment Advisors

Inc. ("Amerindo U.S.") was a corporation organized under the laws of the State of California.

Amerindo U.S. had its principal offices in San Francisco and New York, New York.  Amerindo

U.S. managed assets of institutional clients and at certain times was the investment adviser to one

or more U.S. mutual funds.  Amerindo U.S. was, at all times relevant to this Indictment,

registered with the United States Securities and Exchange Commission ("SEC") as an investment

adviser.

    2.    At all times relevant to this Indictment, Amerindo Investment Advisors,

Inc. ("Amerindo Panama") purported to be a corporation organized under the laws of Panama.

Amerindo Panama was, among other things, purportedly the investment manager of the

Amerindo Technology Growth Fund ("ATGF"), an off-shore, Panamanian investment fund

offered to investors. The defendants named Amerindo Panama in such a way to confuse

investors about the identity of the investment advisor with which they were dealing. The only

difference between the name of Amerindo Panama and that of Amerindo U.S. was the presence

of a comma between the words "Advisors" and "Inc."

       3.     At all times relevant to this Indictment, Amerindo Investment Advisors

(UK) Ltd. ("Amerindo U.K.") purported to be a company that managed portfolios of U.S.

emerging growth stocks for U.K.-based clients. Amerindo U.K. had an office in London where

the founders of Amerindo worked, and where certain administrative and other functions related

to Amerindo Panama were performed, including meeting with and corresponding with investors,

preparation of client account statements, processing investor redemption requests, and directing

equity trades and financial transactions involving investor funds. Amerindo U.S., Amerindo

Panama, Amerindo U.K., and subsets of that group of entities and their predecessors, are

collectively referred to hereafter as "Amerindo."

       4.     ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, was

one of the original founders of Amerindo U.S. and of the predecessor companies to Amerindo

Panama and Amerindo UK, and was, at all times relevant to this Indictment, a shareholder,

officer and director of Amerindo U.S., and one of the two shareholders, directors, and officers of

Amerindo Panama and Amerindo UK. VILAR received an undergraduate degree from

Washington & Jefferson College, and subsequently pledged and donated millions of dollars to

his alma mater. VILAR also pledged and contributed millions of dollars to various organizations

that supported opera and the arts, including the Metropolitan Opera in Manhattan, and the

American Academy in Berlin.

5.      GARY ALAN TANAKA, the defendant, was one of the original founders of Amerindo U.S., and was, at all times relevant to this Indictment, a shareholder, officer and director of Amerindo U.S., and one of the two shareholders, directors, and officers of Amerindo Panama and Amerindo UK.  TANAKA directed the actions of the Amerindo traders based in both London and San Francisco, California, and was responsible for allocating the securities purchased by Amerindo among Amerindo's clients and the funds which Amerindo U.S., Amerindo Panama and Amerindo UK advised and managed.

### The Scheme to Defraud

6.      From at least as early as in or about July 1986 to on or about May 26, 2005, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, perpetrated a scheme to defraud investors by soliciting millions of dollars of funds under false pretenses, failing to invest investors' funds as promised, and misappropriating and converting investors' funds to their own benefit and the benefit of others without the knowledge or authorization of the investors.  To execute the scheme, VILAR and TANAKA solicited and caused others to solicit victims to invest in fraudulent investment products, including the Amerindo SBIC Venture Fund LP and the Guaranteed Fixed Rate Deposit Account Program ("GFRDAs").  VILAR and TANAKA induced victims to invest in these products by, among other things, promising high rates of return, with little or no risk, within short periods of time.  In truth and in fact, as VILAR and TANAKA well knew, these investment opportunities were fraudulent.  VILAR and TANAKA failed to fulfill their promises to the investors by, among other things, failing to invest the funds as promised, unilaterally changing the terms of the investments, and failing to redeem the investments upon the investors' requests.

3

## Victim No. 1's Investments With Amerindo

7.      Beginning in or about 1987, and continuing up to in or about February 2005, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, met with Victim No. 1 and described various investment opportunities to her.  As a result of these solicitations by VILAR, Victim No. 1 entrusted millions of dollars of investments to Amerindo.

8.      Beginning in or about 1987, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused numerous account statements to be sent to Victim No. 1 from Amerindo.  Until in or about September 1995, those statements were printed on stationery bearing the name "Amerindo Investment Advisors Inc.," the name of Amerindo U.S., and the address of Amerindo U.K.  Beginning in or about October 1995, Victim No. 1 received account statements from Amerindo that were printed on stationery bearing the name "Amerindo Investment Advisors, Inc.," the name of Amerindo Panama, and the address of a post office box in Panama.  The purported value of Victim No. 1's investments managed by Amerindo, as reflected in the account statements provided by Amerindo, peaked at approximately $18 million in or about September 2000, and then sharply dropped over approximately the following two years.

9.      In or about June 2002, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, advised Victim No. 1 to invest in an Amerindo venture (the Amerindo SBIC Venture Fund LP) to take advantage of a U.S. government program designed to promote venture capital investment in small businesses (the "Amerindo SBIC").  Relying on VILAR's false and fraudulent representations regarding the Amerindo SBIC investment, as described below, Victim No. 1 agreed to invest approximately $5 million in the Amerindo SBIC.

4

### The SBIC Program

10.     During a period between in or about 2000 and on or about September 30, 2004, the United States Small Business Administration (the "SBA") provided funding for the Participating Securities SBIC Program (the "SBIC Program"). Under the SBIC Program, a qualified private venture capital firm that had received an SBIC license from the SBA was eligible to receive matching funds through SBA guarantees. Those matching funds allowed the SBICs to gain the benefits of increasing the amount of available investment funds without the need to raise additional private capital.

11.     The first step in the applicable SBIC licensing process was to complete a Management Assessment Questionnaire ("MAQ"). If a MAQ satisfied the SBA's criteria, an applicant would then receive a "go forth" letter, inviting the applicant to apply for an SBIC license within the following 18 months. If an applicant did not receive a "go forth" letter, it could not apply for an SBIC license.

12.     An applicant that was invited to apply for an SBIC license was required to submit with its application commitment letters from institutions and individuals that had agreed to invest a minimum of $10 million in the SBIC if it was licensed, of which no more than 30% was permitted to come from the principals or affiliated or associated individuals or entities. After an applicant applied for an SBIC license, but prior to that application being approved, the applicant was required to demonstrate that it had $2.5 million of the $10 million minimum deposited in a separate bank account set up for the SBIC.

### Amerindo's Failed Efforts To Obtain An SBIC License

13.    Amerindo made approximately four unsuccessful attempts to obtain an

SBIC license for an Amerindo SBIC beginning in or about 2000, with the assistance of

experienced legal counsel.  Amerindo first submitted a MAQ to the SBA in or about January

2000.  Although Amerindo received a "go forth" letter in or about April 2000, based on a

presentation made by VILAR to the SBA Investment Committee on or about April 18, 2000, its

license application was rejected.  Amerindo submitted a second, and subsequently a third MAQ,

in or about May and September 2002, respectively.

14.    On or about December 27, 2002, the Chief Administrative Officer of the

SBA's Investment Division sent a letter to VILAR in which she stated, among other things,

"Review of the third MAQ by the Investment Committee produced numerous areas of concern."

Those concerns included, among other things, the facts that the principals were located in three

different geographic areas (New York, Virginia, and the United Kingdom), and the fact that

VILAR would be spending a small fraction of his time on the Amerindo SBIC compared to his

interest in the SBIC.  That letter concluded, "I am sorry to have to write this letter to you, but we

feel that if we proceeded, after receiving three submissions to date, that it would be at

considerable time and expense to your team (as well as ourselves), and that ultimately, the

Agency Licensing Committee would reject your application."  Amerindo did not receive a "go

forth" letter as a result of its submission of the third MAQ.

15.    In or about January 2004, ALBERTO WILLIAM VILAR, a/k/a "Albert

Vilar," and GARY ALAN TANAKA, the defendants, and Amerindo, filed a fourth MAQ with

the SBA.  In each of the four MAQs submitted by Amerindo in an effort to obtain a license for an Amerindo SBIC, VILAR and TANAKA were listed as principals of the entity to be licensed.

16.     In or about February 2004, the SBA posted on its website a notice indicating that, due to a lack of funding by Congress of the SBIC Program, there was no guarantee that applications submitted after approximately the end of March 2004 would be eligible to receive leverage funding.  Amerindo abandoned its fourth attempt to obtain an SBIC license after on or about May 28, 2004, and neither ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, Amerindo U.S., nor any of the affiliated Amerindo entities ever received the license required to apply for leverage funds under the SBIC Program.

### Defendant Vilar's False And Fraudulent Statements
### To Victim No. 1 Regarding The Amerindo SBIC Investment

17.     In or about June 2002, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, told Victim No. 1 that VILAR and GARY ALAN TANAKA, the defendant, were personally investing in a new venture involving investments in small businesses, including biotechnology companies, that would be supported by the government.  VILAR told Victim No. 1 that the venture had been approved by the government, and invited Victim No. 1 to join VILAR and TANAKA in the venture as the only outside partner.  VILAR recommended that Victim No. 1 invest approximately $5 million in the venture.  VILAR promised Victim No. 1 that Victim No. 1 would be able to receive approximately $250,000 each quarter from Victim No. 1's investments managed by Amerindo.

## The Defendants' Unauthorized Conversion
## Of Victim No. 1's $5 Million SBIC Investment

18.     Victim No. 1's approximately $5 million investment in the Amerindo

SBIC was deposited into an account at a New York City brokerage firm (the "Brokerage Firm")

that was opened by ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN

TANAKA, the defendants, in or about 1987, on behalf of a Panamanian corporation named

"Amerindo Management Inc." (the "AMI Account"), of which VILAR held the title of President

and TANAKA held the title of Vice President.  On or about June 20, 2002, the AMI Account

held numerous equity positions in technology stocks, and had a negative cash balance of

approximately $428,122, prior to the incoming transfer of Victim No. 1's approximately $5

million SBIC investment.

19.     On or about June 25 and June 26, 2002, the Brokerage Firm received

letters of authorization ("LOAs") signed by GARY ALAN TANAKA, the defendant, directing

the Brokerage Firm to transfer by wire from the AMI Account approximately:

        a.      $1 million to an account at Chase Manhattan Bank held in the

name of "A.W. Vilar" (the "Vilar Account");

        b.      $650,000 to an account at Chase Manhattan Bank held in the name

of Amerindo Investment Advisors Inc. (the "Amerindo Account"); and

        c.      $500,000 to a trust account at Bank of New York (the "Trust

Account").

20.     On or about July 9, 2002, the Brokerage Firm received an LOA signed by

GARY ALAN TANAKA, the defendant, directing the Brokerage Firm to transfer a sum of

approximately $3,102,958.85 from the AMI Account to an overseas account maintained by another investor (Victim No. 2) in Luxembourg (the "Luxembourg Account").

21.     The Brokerage Firm executed the wire transfer instructions described in paragraphs 19 and 20, above, on or about the respective dates it received the LOAs.

22.     All but approximately $45,000 of the approximately $1 million from Victim No. 1's Amerindo SBIC investment that was wire transferred to the Vilar Account was spent within two weeks on charitable contributions and personal expenses of ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, including contributions to Washington & Jefferson College and the American Academy in Berlin. The remainder of that portion of Victim No. 1's investment was dissipated soon thereafter, and none of the funds transferred to the Vilar Account were invested in the Amerindo SBIC.

23.     The approximately $650,000 of Victim No. 1's investment in the Amerindo SBIC that was transferred into the Amerindo Account was spent on Amerindo business expenses, and none of those funds was invested in the Amerindo SBIC.

24.     At least approximately $400,000 of the approximately $500,000 of Victim No. 1's Amerindo SBIC investment that was transferred to the Trust Account was used to make an investment on behalf of Victim No. 1 that was unrelated to the Amerindo SBIC, and which investment Victim No. 1 believed would be paid for by funds Victim No. 1 had invested with Amerindo separate and apart from the approximately $5 million investment Victim No. 1 had made in the Amerindo SBIC. None of the approximately $500,000 was invested in the Amerindo SBIC.

9

25.     The remainder of Victim No. 1's investment in the Amerindo SBIC, amounting to approximately $2.85 million, was part of the approximately $3,102,958.85 wire transfer to the Luxembourg Account, which funds were used to partially redeem Victim No. 2's investment in an Amerindo GFRDA, as described below.

### The Defendants' False and Misleading Statements
### Concerning Victim No. 1's $5 Million Amerindo SBIC Investment

26.     After obtaining Victim No. 1's approximately $5 million investment in the Amerindo SBIC venture, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar, the defendant, repeatedly made false and fraudulent statements to Victim No. 1 concerning her investment in the Amerindo SBIC, including the following:

a.     On or about March 13, 2003, VILAR wrote a letter on Amerindo U.S. letterhead to Victim No. 1 in which he stated that although there had been an "unprecedented bear market [for] the last three years . . . the monies put into escrow for the new SBIC fund remain at full value." Later in the same letter he stated that, "We are now awaiting permission to commence investing the funds we have placed into escrow, which we expect to happen fairly soon." In fact, as described above, Amerindo, VILAR and GARY ALAN TANAKA, the defendants, had been repeatedly rebuffed in their efforts to obtain an SBIC license; Victim No. 1's funds were not placed in escrow; and VILAR and TANAKA had long since spent Victim No. 1's approximately $5 million investment on, among other things, personal and business expenses.

b.     On or about March 25, 2004, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, caused a letter to be sent on Amerindo U.S. letterhead to the

accountant of Victim No. 1 in which he stated in part that he had been required "to deposit the requisite key money" in connection with Amerindo's efforts to obtain an SBIC license. In that letter, VILAR also stated that while waiting for the license, "the prices of technology private-placements continued to decline . . . . This means that we did not use a single penny of [Victim No. 1's] investment during this declining period, and if and when, as expected, we start to make investments upon securing the renewal of our license later this year, we will be looking at the best prices probably ever seen in the four decade plus history of technology based, venture capital." At the time VILAR signed this letter, and as described above: (i) an applicant at the MAQ stage of the SBIC licensing process need not have capital on deposit until it is invited to apply for a license, which Amerindo was never invited to do during the period following Victim No. 1's approximately $5 million investment; (ii) Amerindo's third and fourth MAQs did not report the investment of approximately $5 million by Victim No. 1 in the Amerindo SBIC; and (iii) VILAR and GARY ALAN TANAKA, the defendant, had long since spent Victim No. 1's approximately $5 million investment on, among other things, personal and business expenses.

        c.      On or about October 25, 2004, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, caused a memo on Amerindo U.S. letterhead to be sent to Victim No. 1's lawyer, in which he wrote in part:

> Funds on deposit with SBIC, for $5 million. Technically this represents an escrow deposit for a technology-based SBIC. [Victim] has effectively coinvested with [me] in a new fund that has been approved for investment, but the actual funding leverage-supplement has been delayed owing to budgetary problems in Washington, due to the increase in the deficit and the Iraqi war.

In fact, as described above: (i) Victim No. 1's approximately $5 million investment in the Amerindo SBIC was not on deposit with the SBIC, and was not being held in escrow; (ii) Amerindo had not received an SBIC license and was not likely to receive such a license in the near future; (iii) SBA funding for the SBIC Program was not "delayed," but rather had been canceled; and (iv) VILAR and GARY ALAN TANAKA, the defendants, had long since spent Victim No. 1's approximately $5 million investment on, among other things, personal and business expenses.

        d.      On or about November 8, 2004, VILAR and TANAKA caused an account statement to be sent from London, England, to Victim No. 1 in New York, New York, via a private commercial courier, in which Victim No. 1's approximately $5 million investment was described as "FUNDS ON DEPOSIT WITH SBIC," and which reflected "INTEREST ON SBIC DEPOSIT" in the amount of approximately $225,000.

### The Defendants' Conversion Of Additional Funds Invested By Victim No. 1

        27.      As of on or about June 30, 2003, according to an account statement furnished to Victim No. 1 by Amerindo, Victim No. 1 had entrusted a total of approximately $11,045,370.02 in investment funds to VILAR, TANAKA and Amerindo, including approximately $2,067,597 held in Victim No. 1's account at the Brokerage Firm ("Victim No. 1's Account").

        28.      On or about September 25, 2003, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused an LOA to be sent from Amerindo to the Brokerage Firm. The LOA bore the signature of TANAKA and the forged signature of Victim No. 1 and directed that approximately $250,000 be transferred from Victim

No. 1's Account to an account held at the Brokerage Firm in the name of "Amerindo Technology Growth Fund Inc." ("ATGF I").

29.     On or about September 26, 2003, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused another LOA signed by TANAKA to be sent from Amerindo to the Brokerage Firm directing that approximately $250,000 be transferred from ATGF I to a personal account held by VILAR at Wilmington Trust Company, in Wilmington, Delaware  (the "Wilmington Trust Account").

30.     During an approximately one-month period following the transfer of the approximately $250,000 described in paragraph 29 into the Wilmington Trust Account, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, spent the funds on, among other things, the personal expenses of VILAR, including the repayment of a mortgage obligation in the amount of approximately $53,042.83.

### The GFRDA Program

31.     Beginning in or about 1986, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, solicited and caused others to solicit victims to invest in Amerindo Guaranteed Fixed Rate Deposit Accounts ("GFRDAs") – a sham product offered by the defendants to Amerindo clients.  The defendants induced clients to invest in GFRDAs by promising to invest the majority of each investor's funds in short-term debt instruments, with little or no risk, that would earn a fixed interest rate, generally at a rate substantially above the prevailing rates available from banks and other institutions.  The defendants further promised the investors that the balance of their funds in their GFRDA accounts – generally no more than 25 percent of the account value – would be invested in

13

publicly traded emerging growth stocks. In truth and in fact, as the defendants well knew, Amerindo did not purchase short-term debt instruments as had been promised to GFRDA investors and failed to provide GFRDA investors with the promised rate of return on their GFRDA investments.

32.     From in or about July 1986 through in or about June 2002, in order to induce Amerindo clients to invest in GFRDAs, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, prepared, distributed, and caused to be distributed, offering circulars dated July 1, 1986 ("1986 Offering Circular"), December 19, 1988 ("1988 Offering Circular"), September 1998 ("1998 Offering Circular") and June 2002 ("2002 Offering Circular"). The offering circulars contained numerous false and misleading statements of material facts including, among others, the following:

a.     The 1986, 1988, 1998 and 2002 Offering Circulars identified various Amerindo investment entities as having a role in the GFRDA offering and were drafted in such a way as to mislead investors about the identities of the offeror and guarantor of the GFRDA investment product. For example, the cover of the 2002 Offering Circular indicated that "Amerindo" had locations in New York, San Francisco, Minneapolis and London. The cover page of the 2002 Offering Circular identified the "offeree" as "Amerindo Investment Advisors, Inc." (Amerindo Panama) and stated, "The investments of the Deposit Account are managed by Amerindo Investment Advisors, Inc." The contents of the 2002 Offering Circular referred to "Amerindo" as the investment manager of GFRDAs and stated that the deposit and interest rate of a client's GFRDA investment would be guaranteed by "Amerindo," which was backed by its two founding partners (VILAR and TANAKA). The final page of the 2002 Offering Circular

14

listed addresses for "Amerindo Investment Advisors Inc." in New York and San Francisco, an

address for "Amerindo Advisors (UK) Limited" in London, and "Amerindo Investment

Advisors, Inc." in Panama.

      b.    The 1986, 1988, 1998 and 2002 Offering Circulars stated that the

investment product being offered to investors through the GFRDA Program would have: (i)

"High Guaranteed Income"; (ii) "Stability of Principal"; (iii) "Liquidity"; and (iv) "Immediate

Confirmation of Purchases, Redemption and Quarterly Interest Payments," when in truth and in

fact VILAR and TANAKA failed to provide investors with their guaranteed fixed rate of return

on their GFRDA investments and failed to liquidate and redeem GFRDA investments when

requested by investors;

      c.    The 1986, 1988 and 1998 Offering Circulars explained that investors in

GFRDAs would deposit cash into a designated account in either the investor's name or an

Amerindo sub-account when in fact all of GFRDA investors' funds were deposited and

commingled in Amerindo's brokerage accounts, including an account held in the name of a

Panamanian corporation named "Techno Raquia, S.A." (the "Techno Raquia Account"), without

such designations;

      d.    The 1986, 1988, 1998 and 2002 Offering Circulars described a GFDRA as

a "diversified" fixed rate account consisting of predominantly "high grade money market

instruments supplemented by a limited number of select common stocks," when in fact GFRDA

investors' funds were not invested in high grade money market instruments; and

      e.    The 1986, 1988, and 1998 Offering Circulars stated, respectively, that

15

"approximately two-thirds," "over three-fourths," and a "majority" of funds invested in GFRDAs would be invested in a range of short-term investments such as Treasury bills, Government National Mortgage Association Certificates (GNMA's), Government bonds, Certificates of Deposit (CD's), and money market funds. The 2002 Offering Circular stated that "[t]he Fixed Rate Deposit Accounts invest principally in a broad range of high grade money market and debt instruments, with maturities generally of one year or less," and further represented that "[a] relatively small portion of the account, generally limited to 25%, will be invested in public companies perceived to have the capacity to undergo exceptional growth of earnings." In fact, none of the funds raised through the GFRDA Program were used to purchase any such short-term debt securities.

33.    ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, sent and caused account statements and other correspondence to be sent to GFRDA investors. Those account statements and correspondence were printed on the letterheads of various Amerindo entities, including Amerindo U.S. and Amerindo Panama, which misled GFRDA investors about which Amerindo entity was responsible for their investment. For example, up until in or about September 1995, account statements were printed on Amerindo U.S. stationery; beginning in or about October 1995, account statements were printed on Amerindo Panama stationery.

34.    Instead of redeeming GFRDA investments upon certain GFRDA investors' requests (the "GFRDA Victims"), ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, on one or more occasions caused the terms of the GFRDA program to be changed without certain of the GFRDA Victims' consent,

16

discouraged certain of the GFRDA Victims from redeeming their GFRDA investments, and diverted funds from other Amerindo clients to repay Amerindo's obligations to certain of the GFRDA Victims.  For example, from in or about January 2003 through in or about 2005, another group of investors ("Victim No. 3") made repeated attempts to redeem part and all of their GFRDA investments.  Instead of redeeming Victim No. 3's investments, VILAR and TANAKA caused a series of communications to be sent to Victim No. 3 to discourage members of Victim No. 3 from redeeming their investments and to attempt to explain why redemption was not possible.  In addition, in or about January 2003, VILAR and TANAKA caused the interest rate on Victim No. 3's GFRDA investment to be unilaterally and retroactively lowered to approximately 8 percent per year through the maturity date of their GFRDA.

## STATUTORY ALLEGATIONS

### The Conspiracy

35.     From at least in or about 1986 to on or about May 26, 2005, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely, (a) to commit fraud in connection with the purchase and sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to commit investment adviser fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17; (c) to commit mail fraud, in violation of Title 18, United States Code, Section 1341; (d) to commit wire fraud, in violation

of Title 18, United States Code, Section 1343; and (e) to commit money laundering, in violation of Title 18, United States Code, Section 1957.

### The Objects of the Conspiracy

### Fraud In Connection With The Purchase Or Sale of Securities

36.     It was a part and an object of the conspiracy that ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing Amerindo to make untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons who invested in and through Amerindo, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Investment Adviser Fraud

37.     It was further a part and an object of the conspiracy that ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, acting as investment advisers with respect to one and more investors and potential investors in products offered by Amerindo Investment Advisors Inc. and its affiliated entities, including Amerindo Panama, unlawfully, willfully, and knowingly, by the use of the mails and means and

18

representations and promises, would and did transmit and cause to be transmitted by means of

wire and radio communication in interstate and foreign commerce, writings, signs, signals,

pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title

18, United States Code, Section 1343.

## Money Laundering

40.     It was further a part and an object of the conspiracy that ALBERTO

WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, in an

offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and

knowingly would and did engage and attempt to engage in and cause others to engage in

monetary transactions in criminally derived property that was of a value greater than $10,000 and

was derived from specified unlawful activity, in violation of Title 18, United States Code,

Section 1957.

## Means And Methods Of The Conspiracy

41.     Among the means and methods by which ALBERTO WILLIAM VILAR,

a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, would and did carry out the

conspiracy were the following:

a.     VILAR and TANAKA opened brokerage accounts in New York,

New York, in the names of Panamanian entities, which accounts were controlled by VILAR and

TANAKA.

b.     VILAR and TANAKA solicited funds from investors by making

false and misleading oral and written representations about the investment for which the

investors' funds were solicited, including false representations about (i) the types of securities in

which investors' funds would be invested, and (ii) the "guaranteed" rate of return that would be generated by their accounts.

        c.      VILAR and TANAKA deposited money received from investors as a result of false and misleading representations into brokerage accounts opened by VILAR and TANAKA in the name of Panamanian entities.

        d.      VILAR and TANAKA misappropriated investors' funds from those brokerage accounts and caused investment funds to be converted to the use of VILAR, TANAKA and others by causing investors' investment funds to be wire transferred to bank accounts controlled by VILAR, TANAKA and others.

        e.      VILAR and TANAKA caused Amerindo investors' funds to be used to repay Amerindo's obligations to other Amerindo investors, rather than in the manner promised to the Amerindo investors.

        f.      VILAR and TANAKA used facilities of interstate and foreign commerce, including the mails and interstate and foreign wire transfers, in furtherance of the objects of the conspiracy.

## Overt Acts

        42.      In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

        a.      In or about September 1987, VILAR and TANAKA opened and caused the Techno  Raquia Account to be opened in New York, New York;

b.      On or about November 1, 1987, VILAR and TANAKA opened and caused the AMI Account to be opened in New York, New York;

c.      In or about 1987, VILAR met Victim No. 3 and provided and caused Victim No. 3 to be provided with the 1986 Offering Circular for an Amerindo GFRDA;

d.      In or about 1989, VILAR met with an investor ("Victim No. 4") in New York, New York, to solicit an investment of approximately $74,000 in an Amerindo GFRDA;

e.      In or about December 1992, VILAR and TANAKA caused an account statement to be sent to Victim No. 3 from Amerindo showing the purported value of Victim No. 3's account;

f.      On or about June 9, 1998, VILAR and TANAKA caused an account statement to be sent to Victim No. 4 from Amerindo showing the purported value of Victim No. 4's GFRDA;

g.      In or about early 2000, VILAR caused an investor ("Victim No. 5") to be provided with the 1998 Offering Circular for an Amerindo GFRDA;

h.      On or about February 10, 2000,  VILAR and TANAKA caused Victim No. 5 to deposit approximately $1 million with Amerindo for a GFRDA;

i.      On or about December 21, 2000, VILAR and TANAKA caused Victim No. 2 to wire approximately $6 million to Amerindo's Techno Raquia Account to invest in an Amerindo GFRDA;

22

j.       In or about December 2000 and January 2001, VILAR and TANAKA caused Victim No. 3 to reinvest approximately $11,066,713.44 in an Amerindo GFRDA;

k.       On or about January 18, 2001, VILAR and TANAKA caused an LOA to be sent to the Brokerage Firm directing the Brokerage Firm to transfer by wire from the Techno Raquia Account approximately $5 million to an account at Barclay's Bank PLC in The Bahamas held in the name of "PTC Management" (the "PTC Account");

l.       On or about January 29, 2001, VILAR caused approximately $3.5 million to be wired from the PTC account to the Vilar Account;

m.       On or about February 1, 2001, VILAR caused a check in the amount of approximately $1.575 million, drawn on the Vilar Account, to be sent to the Metropolitan Opera Association;

n.       In or about June 2002, VILAR met Victim No. 1 at VILAR's New York City apartment to solicit an investment of approximately $5 million in an Amerindo SBIC;

o.       On or about June 25, 2002, VILAR and TANAKA caused approximately $1 million of Victim No. 1's Amerindo SBIC investment to be wire transferred to the Vilar Account;

p.       On or about June 25, 2002, VILAR and TANAKA caused approximately $500,000 of Victim No. 1's Amerindo SBIC investment to be wire transferred to the Trust Account;

q.       On or about June 26, 2002, VILAR and TANAKA caused approximately $650,000 of Victim No. 1's Amerindo SBIC investment to be transferred to the Amerindo U.S. Account;

23

r.      On or about June 27, 2002, VILAR caused a check in the amount of approximately $540,000, drawn on the Vilar Account, to be sent to Washington and Jefferson College;

s.      On or about July 1, 2002, VILAR caused a check in the amount of approximately $177,000, drawn on the Vilar Account, to be sent to the American Academy in Berlin;

t.      On or about July 9, 2002, VILAR and TANAKA caused approximately $3,102,958.85, including approximately $2.85 million of Victim No. 1's Amerindo SBIC investment, to be wire transferred from the AMI Account to the Luxembourg Account to redeem part of Victim No. 2's investment in an Amerindo GFRDA;

u.      On or about August 18, 2003, VILAR and TANAKA caused a false and misleading letter concerning Victim No. 3's Amerindo GFRDA investment to be sent on Amerindo U.S. letterhead to Victim No. 3 in Scarsdale, New York;

v.      On or about September 25, 2003, VILAR and TANAKA caused approximately $250,000 to be transferred from Victim No. 1's Account to ATGF I;

w.      On or about September 26, 2003, VILAR and TANAKA caused approximately $250,000 to be transferred from ATGF I to the Wilmington Trust Account;

x.      On or about September 30, 2003, VILAR caused approximately $53,042.83 to be transferred from the Wilmington Trust Account to repay a mortgage obligation of VILAR;

y.      On or about December 19, 2003, VILAR and TANAKA caused a

letter to be sent from the Amerindo U.K. office on Amerindo Panama letterhead to Victim No. 3

in Scarsdale, New York;

z.      On or about November 8, 2004, VILAR and TANAKA caused a

false and misleading account statement to be sent from London, England, via private commercial

carrier, to Victim No. 1 in New York, New York.

(Title 18, United States Code, Section 371).

### COUNT TWO
(Securities Fraud)

The Grand Jury further charges:

43.     The allegations contained in paragraphs 1 through 34 and 41 through 42

above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as

setting forth a scheme to defraud.

44.     From in or about June 2002 through on or about May 26, 2005, in the

Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert

Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly,

directly and indirectly, by the use of means and instrumentalities of interstate commerce, the

mails, and the facilities of national securities exchanges, did use and employ manipulative and

deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations,

Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making

untrue statements of material facts and omitting to state material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading;

25

and (c) engaging in transactions, acts, practices, and courses of business which operated and

would operate as a fraud and deceit upon persons in connection with the purchase and sale of

limited partnership interests in Amerindo SBIC Venture Fund LP.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

### COUNT THREE
(Securities Fraud)

The Grand Jury further charges:

45.     The allegations contained in paragraphs 1 through 34 and 41 through 42

above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as

setting forth a scheme to defraud.

46.     From in or about 1986 through on or about May 26, 2005, in the Southern

District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and

GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly, directly and

indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the

facilities of national securities exchanges, did use and employ manipulative and deceptive

devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-

5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of

material facts and omitting to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and (c) engaging in

transactions, acts, practices, and courses of business which operated and would operate as a fraud

26

and deceit upon persons in connection with the purchase and sale of notes in the form of

Amerindo Guaranteed Fixed Rate Deposit Accounts.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2).

## COUNT FOUR
(Investment Adviser Fraud)

The Grand Jury further charges:

47.     The allegations contained in paragraphs 1 through 34 and 41 through 42

above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as

setting forth a scheme to defraud.

48.     From in or about June 2002 through on or about May 26, 2005,

ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the

defendants, acting as investment advisers with respect to investors and potential investors in

Amerindo Investment Advisors Inc. and its affiliated entities, unlawfully, willfully, and

knowingly, by the use of the mails and means and instrumentalities of interstate commerce,

directly and indirectly, did: (a) employ devices, schemes, and artifices to defraud clients and

prospective clients; (b) engage in transactions, practices, and courses of business which operated

as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and

courses of business that were fraudulent, deceptive, and manipulative.

(Title 15, United States Code, Sections 80b-6 and 80b-17;
and Title 18, United States Code, Section 2).

## COUNT FIVE
(Mail Fraud)

The Grand Jury further charges:

49.     The allegations contained in paragraphs 1 through 34 and 41 through 42 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

50.     On or about November 8, 2004, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, caused to be deposited any matter or thing whatever to be sent and delivered by any private and commercial interstate carrier, and took and received therefrom, any such matter and thing, and knowingly caused to be delivered by such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it is addressed, any such matter and thing; to wit, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, sent and caused to be sent and delivered via a private and commercial interstate carrier a false and fraudulent account statement from London, England, to Victim No. 1 in New York, New York.

(Title 18, United States Code, Sections 1341 and 2).

28

## COUNT SIX
(Wire Fraud)

The Grand Jury further charges:

51.     The allegations contained in paragraphs 1 through 34 and 41 through 42 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

52.     On or about June 25, 2002, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice; to wit, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused approximately $1,000,000 of Victim No. 1's investor funds to be sent by wire from outside New York State, to a bank in New York, New York, which funds were subsequently converted to the defendants' own use without the knowledge, authorization, or permission of Victim No. 1.

(Title 18, United States Code, Sections 1343 and 2).

**COUNT SEVEN**
(Wire Fraud)

The Grand Jury further charges:

53.     The allegations contained in paragraphs 1 through 34 and 41 through 42 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

54.     On or about July 9, 2002, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice; to wit, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, caused approximately $2.85 million of Victim No. 1's investor funds to be sent by wire from outside New York State, to a bank in New York, New York, which funds were subsequently converted to the defendants' use and the use of others without the knowledge, authorization, or permission of Victim No. 1.

(Title 18, United States Code, Sections 1343 and 2).

30

## COUNTS EIGHT THROUGH ELEVEN
(Money Laundering)

The Grand Jury further charges:

55.     The allegations contained in paragraphs 1 through 34 and 41 through 42 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

56.     On or about the dates set forth below, in the Southern District of New York and elsewhere, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly engaged and attempted to engage in and cause others to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, to wit, securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, mail fraud in violation of Title 18, United States Code, Section 1341, and wire fraud in violation of Title 18, United States Code, Section 1343, as set forth below:

| COUNT | APPROXIMATE DATE | TRANSACTION |
| --- | --- | --- |
| EIGHT | June 25, 2002 | Wire transfer in the amount of approximately $1,000,000 from the AMI Account to the Vilar Account |
| NINE | June 25, 2002 | Wire transfer in the amount of approximately $500,000 from the AMI Account to the Trust Account |

| COUNT | APPROXIMATE DATE | TRANSACTION |
|-------|------------------|-------------|
| TEN | June 26, 2002 | Wire transfer in the amount of approximately $650,000 from the AMI Account to the Amerindo Account |
| ELEVEN | July 9, 2002 | Wire transfer in the amount of approximately $3,102,958.85 from the AMI Account to an account at Lloyd's TSB Bank (Luxembourg) |

(Title 18, United States Code, Sections 1957 and 2).

**COUNT TWELVE**
(False Statements)

The Grand Jury further charges:

57.     The allegations contained in paragraphs 1 through 34 and 41 through 42 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

58.     At all relevant times, as described in paragraph 1 above, Amerindo U.S. was an investment adviser registered with the SEC. As such, Amerindo U.S. was subject to periodic examinations by the SEC.

59.     In a letter dated on or about April 8, 2005 (the "SEC Letter"), the SEC notified the Chief Compliance Officer of Amerindo U.S. that the SEC had received a complaint letter sent on behalf of Victim No. 1 ("Victim No. 1's Complaint Letter"), and requested a response to the issues raised in that letter. Victim No. 1's Complaint Letter stated in substance that: (a) Amerindo had ignored written instructions from Victim No. 1 to transfer all securities and funds in Victim No. 1's account with Amerindo to another account at the Brokerage Firm; (b) ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," the defendant, had responded to Victim No. 1's request by contending that Victim No. 1 needed to send a letter to the Amerindo office in

32

Panama; and (c) Amerindo would first deduct unspecified fees that had accrued during the

approximately 18 years that Victim No. 1's Amerindo account had been in existence. The SEC

Letter stated, "Please analyze the complaint carefully and prepare a written report addressing all

the issues raised in the complaint. Your report should describe clearly the actions you are taking

in response to the complaint. If appropriate, provide us with complete documentation supporting

your findings."

      60.     ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN

TANAKA, the defendants, prepared a letter responding to the SEC Letter and Victim No. 1's

complaint, and caused that letter (the "Response") to be sent by facsimile on or about May 20,

2005, from Amerindo's offices in New York, New York, to an SEC office in San Francisco,

California. The Response contained numerous false statements made for the purpose of

deceiving the SEC and hiding the defendants' unlawful conduct described in paragraphs 1

through 34 and 41 through 42, above. The Response stated, among other things, in substance,

that: (a) Victim No. 1 had always been a client of Amerindo Panama; (b) Amerindo Panama had

previously been owned by VILAR and TANAKA, but had been sold in or about 2001 to

unrelated third parties; (c) as of on or about May 20, 2005, there was no common ownership of

Amerindo U.S. and Amerindo Panama; and (d) as of on or about May 20, 2005, there was no

overlap between the directors, officers and employees of Amerindo U.S. and Amerindo Panama.

      61.     On or about May 20, 2005, in the Southern District of New York,

ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the

defendants, unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the

executive branch of the Government of the United States, namely, the SEC, falsified, concealed,

and covered up by trick, scheme, and device material facts, and made materially false, fictitious, and fraudulent statements and representations, and made and used a document knowing it to contain materially false, fictitious, and fraudulent statements, to wit, VILAR and TANAKA sent a letter to the SEC, in which they made the following false statements and concealed and covered up facts that were material to the SEC's investigation:

### Specification One

VILAR and TANAKA falsely stated that as of May 20, 2005, "there [wa]s no common ownership with respect to Amerindo and Amerindo Panama."

### Specification Two

VILAR and TANAKA falsely stated that as of May 20, 2005, "there [wa]s no overlap between the directors, officers and employees of Amerindo and Amerindo Panama."

### Specification Three

VILAR and TANAKA falsely stated that, "[t]he present owners of Amerindo formerly owned Amerindo Panama but they sold it to its present owners in 2001."

(Title 18, United States Code, Sections 1001(a) and 2).

### FORFEITURE ALLEGATIONS

62.     As a result of committing one or more of the investment adviser fraud, securities fraud, mail fraud and wire fraud offenses, alleged in Counts One through Seven of this Indictment, in violation of Title 15, United States Code, Sections 80b-6, 80b-17, 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Sections 371, 1341, 1343 and 2, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, shall forfeit to the United States, pursuant to Title 18, United

States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to at least $19,706,363.74 in United States currency, representing the proceeds obtained as a result of the charged securities, mail and wire fraud offenses alleged in this Indictment, for which the defendants are jointly and severally liable.

63.     As a result of committing one or more of the money laundering offenses, alleged in Counts Eight through Eleven of this Indictment, in violation of Title 18, United States Code, Sections 1957 and 2, ALBERTO WILLIAM VILAR, a/k/a "Albert Vilar," and GARY ALAN TANAKA, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982, any and all property, real and personal, involved in the money laundering offenses alleged in this Indictment, and all property traceable to such property, including but not limited to at least $5,000,000 in United States currency, in that such sum in aggregate is property which was involved in the money laundering offenses or is traceable to such property, for which the defendants are jointly and severally liable.

<u>Substitute Asset Provision</u>

64.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

35

e.    has been commingled with other property which cannot be

subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and

Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said

defendants up to the value of the forfeitable property described above including but not limited to

the following:

(1)    Any and all right, title and interest in the following companies:

a.    Techno Raquia, S.A.;

b.    Amerindo Management Inc.;

c.    Amerindo Technology Growth Fund Inc.;

d.    Amerindo Technology Growth Fund II, Inc.;

e.    Olafson Inc.;

f.    The Trustees of the Amerindo Advisors (UK) Ltd. Ret. Benefits

Scheme;

g.    Amerindo Master Venture Fund LLC;

h.    Amerindo Investment Advisors Inc. Money Purchase Plan and

Trust; and

i.    Amerindo Internet Growth Fund Ltd.

(2)    Any and all right, title and interest in Bear Stearns & Co., Inc. brokerage

account numbers:

a.    102-17995, held in the name of Techno Raquia, S.A.;

36

    b.  102-01485, held in the name of Amerindo Management Inc., sub-

Account M26;

    c.  102-01490, held in the name of Amerindo Technology Growth

Fund Inc.;

    d.  102-01495 , held in the name of Amerindo Technology Growth

Fund II, Inc.;

    e.  102-15833, held in the name of Olafson, Inc.;


    f.  102-05012, held in the name of The Trustees of the Amerindo

Advisors (UK) Ltd. Ret. Benefits Scheme;

    g.  102-25590, held in the name of Amerindo Master Venture Fund

LLC;

    h.  102-25612, held in the name of Amerindo Investment Advisors

Inc. Money Purchase Plan and Trust; and

    i.  102-27950, held in the name of Amerindo Internet Growth Fund

Ltd.

    (3)  Any and all right, title and interest in one or more apartment units located

at 860 United Nations Plaza, New York, New York; and

(4)    Any and all right, title and interest in 7 High Coombe Place, Warren

Cutting, Kingston Upon Thames, Surrey, England.

(Title 18, United States Code, Sections 981(a)(1)(C) and 982, Title 21, United States Code,
Section 853, and Title 28, United States Code, Section 2461).

_____                    _____
FOREPERSON                                          MICHAEL J. GARCIA

38

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### ALBERTO WILLIAM VILAR,
### a/k/a "Albert Vilar,"
### GARY ALAN TANAKA,

**Defendants.**

### INDICTMENT

S 3 05 Cr. 621 (KMK)

15 U.S.C. §§ 80b-6, 80b-17, 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
18 U.S.C. §§ 371, 1001, 1341, 1343, 1957 and 2

MICHAEL J. GARCIA
United States Attorney.

*Bal Lewis*

8/15/06 - Fld. Superseding Indictment,
S 05 Cr. 621 (KMK)

*Eaton, J. U.S.M.J.*

EXHIBIT H

✎AO 245B    (Rev. 06/05) Judgment in a Criminal Case
             Sheet 1

# UNITED STATES DISTRICT COURT

| SOUTHERN | District of | NEW YORK |
|---|---|---|

| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
|---|---|
| V. | |

|  |  |
|---|---|
| Alberto Vilar | Case Number:    05 Cr. 621-01(RJS) |
|  | USM Number:    57828-054 |
|  | Jonathan Marks |
|  | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

✓ was found guilty on count(s)    1 through 12
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Securities Fraud | May 26, 2005 | 1 |
| 15 U.S.C. § 78j(b) & 78ff | Securities Fraud | May 26, 2005 | 2&3 |
| 15 U.S.C. § 80b-6 & 80b-17 | Investment Advisor Fraud | May 26, 2005 | 4 |
| 18 U.S.C. § 1341 | Mail Fraud | May 26, 2005 | 5 |
| 18 U.S.C. § 1343 | Wire Fraud | May 26, 2005 | 6 & 7 |
| 18 U.S.C. § 1957 | Money Laundering | May 26, 2005 | 8-11 |

   The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

| ☐ Count(s) | _____ | ☐ is | ☐ are | dismissed on the motion of the United States. |
|---|---|---|---|---|
| ✓ Underlying | Original indictment, S1 and S2 | ☐ is | ✓ are | dismissed on the motion of the United States. |
| ☐ Motion(s) | _____ | ☐ is | ☐ are | denied as moot. |

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

February 5, 2010
Date of Imposition of Judgment

Signature of Judge

Richard J. Sullivan, District Judge
Name and Title of Judge

February 8, 2010
Date

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _421_
DATE FILED: 2/8/10

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
        Sheet 1A

Judgment—Page   2   of    7

DEFENDANT:         Alberto Vilar
CASE NUMBER:     05 Cr. 621-01(RJS)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1001(a) | False Statements | May 26, 2005 | 12 |

AO 245B   (Rev. 06/05) Judgment in Criminal Case
    Sheet 2 — Imprisonment

Judgment — Page   3   of   7

DEFENDANT:   Alberto Vilar
CASE NUMBER:  05 Cr. 621-01(RJS)

## IMPRISONMENT

   The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

### 108 months

☑ The court makes the following recommendations to the Bureau of Prisons:

  **The Court recommends that Defendant be housed at either FCI Otisville or FCI Fort Dix.**

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

  ☐ at  _____ ☐ a.m. ☐ p.m.   on  _____ .

  ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

  ☐ before 2 p.m. on  _____ .

  ☐ as notified by the United States Marshal.

  ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B   (Rev. 06/05) Judgment in a Criminal Case
        Sheet 3 — Supervised Release

Judgment—Page __4__ of __7__

DEFENDANT:    **Alberto Vilar**
CASE NUMBER:  **05 Cr. 621-01(RJS)**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

Three years

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

√    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

√    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if

√    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 06/05) Case 1:05-cr-00621-RJS   Document 421   Filed 02/08/10   Page 5 of 7
           Sheet 3A — Supervised Release

Judgment—Page   5   of   7

DEFENDANT:        Alberto Vilar
CASE NUMBER:      05 Cr. 621-01(RJS)

## ADDITIONAL SUPERVISED RELEASE TERMS

The defendant shall provide the probation officer with access to any requested financial information.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

The defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the bassi that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found.  The search must be conducted at a reasonable time and in a reasonable manner.  Failure to submit to a search may be grounds for revocation.  The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

The defendant shall be supervised in the district of his residence.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
           Sheet 5 — Criminal Monetary Penalties

                                                                    Judgment — Page  6      of      7

DEFENDANT:         Alberto Vilar
CASE NUMBER:       05 Cr. 621-01(RJS)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $  1200 | $    25,000 | $ |

√   The determination of restitution is deferred   __90 days__  .  An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| TOTALS | $ _____ $0.00 | $ _____ $0.00 | |

☐   Restitution amount ordered pursuant to plea   _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐   the interest requirement is waived for    ☐ fine   ☐ restitution.

☐   the interest requirement for    ☐ fine   ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Case 1:05-cr-00621-RJS   Document 421   Filed 02/08/10   Page 7 of 7

AO 245B   (Rev. 06/05) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT:   Alberto Vilar
CASE NUMBER:   05 Cr. 621-01(RJS)

Judgment — Page   7   of   7

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A  √   Lump sum payment of $ _____26,200_____ due immediately, balance due

☐   not later than_____ , or
☐   in accordance   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B  ☐   Payment to begin immediately (may be combined   ☐C,   ☐ D, or   ☐ F below); or

C  ☐   Payment in equal_____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of
_____ (e.g., months or years), to _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐   Payment in equal_____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of
_____ (e.g., months or years), to _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

E  ☐   Payment during the term of supervised release will commence _____ (e.g., 30 or 60 days) after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time;

F  ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is
due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several
and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

√   The defendant shall forfeit the defendant's interest in the following property to the United States:

The defendant shall forfeit property in an amount to be determined by a separate order.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal,
(5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

℈AO 245B   (Rev. 06/05) Judgment in a Criminal Case
        Sheet 1

# UNITED STATES DISTRICT COURT

| SOUTHERN | District of | NEW YORK |
|---|---|---|

| UNITED STATES OF AMERICA<br>V. | JUDGMENT IN A CRIMINAL CASE |
|---|---|

|  |  |  |
|---|---|---|
| Gary Alan Tanaka | Case Number: | 05 Cr. 621-02(RJS) |
|  | USM Number: | 57819-054 |
|  | Glenn Colton |  |
|  | Defendant's Attorney |  |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
    which was accepted by the court.

√ was found guilty on count(s)   1, 3, and 4 _____
    after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Securities Fraud | May 26, 2005 | 1 |
| 15 U.S.C. § 78j(b) & 78ff | Securities Fraud | May 26, 2005 | 3 |
| 15 U.S.C. § 80b-6 & 80b-17 | Investment Advisor Fraud | May 26, 2005 | 4 |

    The defendant is sentenced as provided in pages 2 through _____6_____ of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   2, 5-12

| ☐ Count(s) | _____ | ☐ is | ☐ are | dismissed on the motion of the United States. |
|---|---|---|---|---|
| √ Underlying | Original indictment, S1 & S2 | ☐ is | √ are | dismissed on the motion of the United States. |
| ☐ Motion(s) | _____ | ☐ is | ☐ are | denied as moot. |

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

February 5, 2010
Date of Imposition of Judgment

_____
Signature of Judge

Richard J. Sullivan, District Judge
Name and Title of Judge

February 9, 2010
Date

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/10/10

AO 245B   (Rev. 06/05) Judgment in Criminal Case
            Sheet 2 — Imprisonment

Judgment — Page ___2___ of ___6___

**DEFENDANT:**          Gary Alan Tanaka
**CASE NUMBER:**      05 Cr. 621-02(RJS)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

### Sixty months

√ The court makes the following recommendations to the Bureau of Prisons:

**The Court recommends that defendant be housed at a minimum- or low-security facility near Los Angeles, California, where his mother resides.**

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

√ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    √ before 2 p.m. on __April 5, 2010_____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
           Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___6___

DEFENDANT:        Gary Alan Tanaka
CASE NUMBER:      05 Cr. 621-02(RJS)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

**Three years**

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

√    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

√    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if

√    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
           Sheet 3A — Supervised Release

Judgment—Page __4__ of __6__

DEFENDANT:        Gary Alan Tanaka
CASE NUMBER:      05 Cr. 621-02(RJS)

## ADDITIONAL SUPERVISED RELEASE TERMS

The defendant shall provide the probation officer with access to any requested financial information.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless the defendant is in compliance with the installment payment schedule.

The defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the bassi that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. The search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

The defendant shall be supervised in the district of his residence.

AO 245B   (Rev. 06/05) Judgment in a Criminal Case
        Sheet 5 — Criminal Monetary Penalties

Judgment — Page  5  of  6

DEFENDANT:        Gary Alan Tanaka
CASE NUMBER:     05 Cr. 621-02(RJS)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $ 300 | $ 25000 | $ |

The determination of restitution is deferred   90 days  . An *Amended Judgment in a Criminal Case* (AO 245C) will be after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |

| TOTALS | $ _____ $0.00 | $ _____ $0.00 |
|---|---|---|

☐  Restitution amount ordered pursuant to plea   _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐  the interest requirement is waived for   ☐ fine  ☐ restitution.

    ☐  the interest requirement for   ☐ fine  ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B   (Rev. 06/05) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___6___ of ___6___

DEFENDANT:      **Gary Alan Tanaka**
CASE NUMBER:    **05 Cr. 621-02(RJS)**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A   √   Lump sum payment of $ _25,300_____ due immediately, balance due

      ☐   not later than_____ , or
      ☐   in accordance   ☐ C,   ☐ D,   ☐   E, or   ☐ F below; or

B   ☐   Payment to begin immediately (may be combined   ☐ C,   ☐ D, or   ☐ F below); or

C   ☐   Payment in equal_____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of
      _____ (e.g., months or years), to   _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐   Payment in equal_____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of
      _____ (e.g., months or years), to   _____ (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

E   ☐   Payment during the term of supervised release will commence   _____ (e.g., 30 or 60 days) after release from
      imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time;

F   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

      Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

√   The defendant shall forfeit the defendant's interest in the following property to the United States:

      The defendant shall forfeit property in an amount to be determined by a separate order.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.